[Civil No. 2802.   Filed December 16, 1929.]

[283 Pac. 719.]

# SOUTHERN PACIFIC COMPANY, a Corporation, Appellant, v. DIEGO GASTELUM, Appellee.

Mr. Francis M. Hartman, for Appellant.

Mr. Harry O. Juliani and Mr. E. T. Cusick, for Appellee.

McALISTER, J.—In this action Diego Gastelum seeks to recover from the Southern Pacific Company, under the Federal Employers' Liability Law (45 U. S. C. A., §§ 51–59), damages suffered by him as a result of an injury received while discharging his duty as an employee of that company. He won a verdict for $1,500 and was awarded judgment in that sum, but feeling this inadequate moved for a new trial of the amount of damages alone. The defendant likewise moved for a new trial and for judgment notwithstanding the verdict, but the court denied both of its motions and at the same time announced that plaintiff's would be denied also if within ten days both parties would file their written consent

that the judgment be increased to $6,500 and that it would be granted if such consent were not filed. This was evidently not agreed to, because a new trial on the question of damages alone was ordered.

The facts out of which the action grew, as disclosed by the complaint and the evidence, are substantially as follows: The plaintiff and twelve other men were camped at Sentinel, Arizona, near which they were working on a bridge. Each night and often at noon for lunch they returned to the station on a track motor-car and a push-car with which the company supplied them for this purpose as well as for hauling materials. Some 200 feet west of the depot at that point the defendant kept a movable platform about four and one-half feet wide by six feet long and made of pine lumber (one-inch boards nailed to two by four's), and it was used in this way: It was placed on the ground between the rails, and the motor-car rested on it in being taken off and put upon the track. On September 2d, 1926, as the men were starting to work after lunch and the motor-car and the push-car had been placed on the track preparatory to returning, the foreman directed that some of the men, without designating which ones, remove the platform from between the rails to a place alongside the track out of the way of passing trains, and after giving this command he and most of the gang proceeded toward the depot taking the cars to be loaded with cement. The plaintiff, Jose Dominguez, and, according to the testimony in behalf of plaintiff, Alfonso Robles, started to remove the platform as the foreman had directed, and as they were in the act of doing so plaintiff fell on the rail and fractured his left thigh bone.

The fall and consequent injury were caused, it is alleged, by the three following negligent acts of the defendant: First, it had carelessly and negligently allowed to remain under the platform on the track a

large rock which he stepped on while lifting the platform and caused him to fall upon the roadbed; second, that two employees of defendant, who assisted him in removing the platform, were negligent and careless, in that one or both of them shoved or pushed it against him and caused him to fall; and, third, that the defendant negligently and carelessly failed to provide sufficient help to assist him in removing the platform.

The defendant demurred to the complaint and the amended reply and pleaded a general denial, a settlement and release in bar of plaintiff's right to recover, his own negligence as the proximate cause of the injury, and the assumption of the risk. Plaintiff replied to the plea in bar by admitting that he received $350 from defendant, but denied that he signed a release, and alleged that if he did sign an instrument of that purport he did not know it at the time. The defendant's demurrer to the complaint and the amended reply were overruled and the case went to trial before a jury.

Two of the charges of negligence were eliminated by the court—the first and the third—but the second, the negligence of Robles in pushing the platform against him and causing him to fall, was permitted to go to the jury, and upon it the verdict for plaintiff was returned. From the judgment entered thereon and the following orders the defendant appeals: Denying its motion for a new trial, denying its motion for judgment notwithstanding the verdict, holding that plaintiff's motion for a new trial would be denied if both parties should within ten days file their consent that the judgment be increased to $6,500, and granting plaintiff a new trial for the purpose of ascertaining the amount of damages only.

In several of its assignments the defendant attacks the sufficiency of the evidence relating to Robles' act in pushing the platform against plaintiff and causing

him to fall as constituting negligence under the Federal Employers' Liability Act (45 U. S. C. A., §§ 51-59). To determine whether this contention is well founded, a statement of the facts causing the injury a little more in detail is required. It appears that Robles was one of the thirteen men working on the bridge near Sentinel, and the evidence in behalf of the plaintiff discloses that as he and Jose Dominguez were in the act of lifting the platform from between the rails, Robles, who had helped remove it many times, came from the tool car near by and took hold of it hurriedly to aid them. Robles and Dominguez were both at the west end looking toward Sentinel, while plaintiff was at the east end alone looking toward Yuma. They lifted it about as high as the knees or waist and were moving sidewise or north with it when it was suddenly and unexpectedly pushed east against plaintiff, whose foot slipped at the same time, whereupon he fell on the rail with the platform on top of the lower part of his body. Robles said:

"I was on the corner of the platform, in the direction of Yuma, Dominguez was on the other corner, and Gastelum was on the other end; he was alone there when I got hold of the corner. We lifted it all together. As I was coming from the tool car where they had the tools, as they were alone and they had hold of it about the center of this place, I caught hold here and as I caught onto it, this man Gastelum fell down. I had hold of it this way. This platform moved a little. I did not push on it; it slipped that way in the change, in making the change. I don't know where it hit him, but it knocked him down. . . .

"I had hold of it this way (indicating one hand on the side and one on the end) and then I changed the right hand here (indicating one of the hands on the corner) and then got inside of the track of the rail, and the platform moved a little forward."

Jose Dominguez testified, in part, as follows:

"Gastelum and I were lifting it up, and when we had it already lifted about three feet, Robles came in on the right-hand side and placed his hand upon it, and in shifting or changing Mr. Gastelum fell down; I saw Robles shift his hand; saw the platform moving towards Gastelum, and he fell down; when Gastelum fell the platform was over his knee; Gastelum fell at the same time that it was moved; when he shifted his hands."

The plaintiff testified, in part, as follows:

"I lifted the platform as high up as this (indicating about the waist) at the time they pushed it on to me. I don't know which one of the crew was the one that pushed it, and when I stepped backwards to put my foot on this side, then was the time that my foot slipped. It could not have been so very much of a push, but at the same time, the same moment I slipped and missed my footing; I don't know upon what I slipped, but I am not sure what kind of a rock it was. I believe it was a rock, because I just simply felt the slip of it and I didn't feel anything for awhile. The slipping of the foot and the shoving was at the same time. At the moment that I placed my foot there to place it on here, then after that I didn't know anything any more. The foreman came there after the accident. I told him I had slipped, and that the platform had fallen on top of me."

In reply to questions propounded by the court, he said that he lifted his right foot and placed it outside the rails (going north sidewise), followed this by putting the left foot on a rock inside the rail, which caused it to slip, and as he did so he was pushed (eastward or backward) and fell; that slipping on the rock and being suddenly and unexpectedly pushed at the same time caused him to fall; that it did not require a very hard push to cause him to fall, since he stepped on the rock at the same time they pushed him.

Robles and Dominguez each made written statements relative to the cause of the accident immediately following its occurrence which were in conflict with the foregoing, and these were introduced in evidence by the defendant. They both admitted making the statements, but gave reasons for doing so that evidently satisfied the jury. A written statement signed by the plaintiff a few minutes after the accident, and reading as follows, was also introduced by the defendant:

"I was lifting a small platform used to take off motor car and placed my foot on rail which slipped off rail, causing me to fall on rail, dislocating left thigh."

The plaintiff, however, denied that he told the foreman immediately following the accident what this statement attributes to him. Three or four of the men in the gang placed on the witness-stand by the defendant testified that Robles did not have hold of the platform when plaintiff fell, but that he was some distance away.

This clearly discloses a conflict in the evidence on the question whether the platform was negligently pushed against the plaintiff by Robles and caused him to fall, and that in support of it being substantial, the conclusion reached thereon by the jury must under the unvarying rule of this court be accepted as correct. The fact that the platform struck plaintiff rather lightly is immaterial, since in the mind of the jury it did so with sufficient force under the circumstances to cause him to fall and produce the injury in question. Having the weight of one end of the platform in his hands and his right foot outside the north rail of the track, it is evident that a light shove of the platform against him while his left foot was slipping from the rock on which he had just placed it would in all probability cause him to lose his balance and fall.

Since there was sufficient evidence to show negligence on the part of Robles, there was no error in the court's refusal to instruct the jury that he could not recover for the negligence of a fellow-servant who aided him in removing the platform because the Federal Employers' Liability Law (45 U. S. C. A., §§ 51–59), under which this action is prosecuted, abrogates the fellow-servant doctrine and specifically provides that the carrier shall be liable for an injury resulting in whole or in part from the negligence of its employees. Federal Employers' Liability Act, § 1 (45 U. S. C. A., § 51); *Southern Ry. Co.* v. *Fisher,* 199 Ala. 377, 74 South. 580; 39 C. J. 674, and the authorities there cited.

The order overruling defendant's demurrer to the amended reply is assigned as error. In this reply plaintiff admits receiving $350 from the defendant, but denies releasing it from any and all claims resulting from the injury, and alleges that if he did sign an instrument purporting to have that effect, his signature thereto was obtained through the fraud and misrepresentations of the defendant because he could not speak, read, write or understand the English language, and at no time was he informed, told or requested through an interpreter that he was to sign any release. He did not return or tender the $350 to defendant before filing suit, and because of this failure the latter contends that he cannot avoid the effect of the release or settlement on the ground of mental incapacity, ignorance or illiteracy at the time the release was executed, and therefore that its demurrer should have been sustained. Following the weight of authority, we have recently held that repayment of the consideration paid for a release secured through fraud, or a tender thereof, is not a condition precedent to the right to institute or maintain an action to recover the damages suffered in an

accident occurring during one's employment. *Atchison, Topeka & Santa Fe Ry. Co.* v. *Peterson,* 34 Ariz. 292, 271 Pac. 406, 410. The grounds upon which this principle rests are applicable here, and we think sound. They were stated in this language:

"Some of the decisions base their ruling upon the ground that it would be useless to require a tender where it would be refused, as in the case of the releasee who claims that the release is valid, while others place it upon the ground that the restoration of that which one is entitled to retain in any event, either as a result of the agreement sought to be set aside or of the original liability, is never required. Both of these grounds are applicable here, for the reason that appellant insists that the release given by appellee is valid, and the court gave it credit on the judgment for the $1,000 paid therefor."

The defendant assigns as error the denial of its motion for a directed verdict made at the close of all the evidence upon the ground, among others, that the release set up as a plea in bar was sustained by the evidence and should have been upheld. This instrument recites a consideration of $250 in addition to $100 theretofore paid and was signed by plaintiff at the claim attorney's office in San Francisco on January 4th, 1927, and a draft on the assistant treasurer of defendant in payment thereof received by him and cashed at the same time. Whether he knew it was a release, as claimed by defendant, or whether he attached his signature to it without its being interpreted to him and under the impression that it was not a release, as contended by him, is very much in dispute, and the only question presented relative thereto is the sufficiency of the evidence to support the jury's conclusion that the latter's position is correct.

The plaintiff was taken to the company's hospital in San Francisco immediately following his injury and remained there until January 4th, 1927. After

he had been there a number of weeks, namely, on November 3d, 1926, he received from the defendant $50, for which he signed a receipt written in English, stating that it was to apply on any donation that might be given or any settlement made by defendant on account of his injury. This payment came about through the solicitation of a close friend of plaintiff's mother, a Mrs. Tully, who represented to the defendant that his family was in need of financial assistance and, according to the plaintiff, explained to him that the money was given him for the help of his family. On December 11th, 1928, a second $50 was paid him under the same circumstances, except that a boy instead of Mrs. Tully acted as interpreter, and a similar receipt signed and delivered. About three weeks later, namely, January 3d, 1927, plaintiff's brother-in-law, Charles K. Willette, was at the hospital, and, according to his testimony, told the plaintiff he was going home (Tucson, Arizona), and the latter remarked that he would like to go also; that the doctor, who had been attending the plaintiff, was in the hospital at the time, and Willette asked him about plaintiff's going, and the reply was that he could go as soon as he saw Mr. Innes, the claim agent of defendant, who happened to be at the hospital at that time.

Mr. Innes testified that the doctor informed him that the plaintiff desired to return home and wanted to settle with the company before he left, whereupon he asked plaintiff to call at his office in another part of the city and, in company with his brother-in-law, Willette, he did so that afternoon; that while in his office they discussed the settlement and agreed that if the company would make a further payment of $250 plaintiff would be satisfied and would execute a release of all claims; that thereupon the witness stated, that he would recommend this to his superiors and requested plaintiff and Willette to return to his office

the following day, which they did; that a release for this sum was prepared, a draft in payment of it drawn, and both handed by him to a clerk from the claim attorney's office, James H. Turner, with direction that he turn the release over to plaintiff for execution, and that after it had been signed the witness identify him at the cashier's office downstairs so that he could cash the draft; that he requested plaintiff to bring an interpreter, and as Willette came with him he thought it was for this purpose; that it was his duty to know as far as possible that one signing a release understands what he is doing and be satisfied himself that plaintiff understood.

According to the witness James H. Turner, Mr. Innes called him into his office on January 4th, 1927, handed him the release and draft, and said, "Mr. Gastelum is going to sign a release and you get the money for him." He states further that he got the draft countersigned, came back to the office of Mr. Newman, claim attorney, handed the release to plaintiff and Willette, who were sitting in the office, and requested the latter to explain the release to the former; that the two sat down in the corner close to each other and talked in Spanish and English about "fifty-fifty"; that in five or ten minutes Willette came up and said that Gastelum had agreed to sign the release, and that thereupon he did so upon Turner's desk, both Willette and the latter signing it as witnesses; that the company has no official interpreter and that Willette did not interpret for the defendant but for his brother-in-law; that "we" told him to bring an interpreter and he brought Willette.

There is a blank form on the back of the release which Turner filled out and Willette signed. It contains the statement that Charles K. Willette has correctly translated the release into the Spanish language in the hearing of Gastelum and that he understood it. Willette, however, who then and at the

time of the trial was a yardman for the Southern Pacific Company, testified that he understood and spoke very little Spanish, and that he did not read the printed matter on the back of the release before he signed it, but did immediately afterwards, and that the statement therein that he translated the release into Spanish to Gastelum was not true; that he told Mr. Turner it was not true but that he knew the release was translated to plaintiff; that immediately after the doctor told plaintiff he could go home as soon as he saw the claim agent, he and Willette went down the hall in the hospital and at the main entrance were two patients in the hospital, Spanish fellows who worked at Yuma, and at the request of the witness they explained the terms of the release to Gastelum in the Spanish language; that when he was told that $250 was to be paid him, in addition to the $100 already received, in full of all claims against the company for his injuries, he understood what was said and agreed to it by saying in English, "That is good," and followed with the statement, "I will be able to go to work pretty soon"; that he did not know the names of the two boys from Yuma nor has he seen them since; that they told Gastelum what was in the release as near as they could, but did not read it to him; that it was not then made out but was first introduced down in Mr. Newman's office, though its terms had been theretofore agreed on in the hospital.

The plaintiff, speaking through an interpreter, testified that he did not ask the doctor in San Francisco if he could return to his home, but that the defendant transferred him to Tucson in order that he might be under the care of the doctors there, and upon his arrival Dr. Davis examined him and told him to return to his office at certain times during the week; that he did not speak or understand the English language and that the release was not interpreted to him by two Mexican boys, Mr. Willette or anyone

else; that he did not know it was a release and would not have signed it if he had; that no one explained to him what the $250 was for; that they spoke to him at the office in English and there was no one there to explain to him in Spanish; that Mr. Willette was there but did not speak a word to him in Spanish; that they placed the paper there (on Turner's desk) and made signs for him to go by, and he signed it. In reply to the query, "What did you think it was?" he said, "As they had previously given me the other money, I did not know what it was, nor did they explain to me what it was for"; and when asked what he thought he was getting $250 for, he said, "They did not say anything to me; I did not know I was getting $250; they would give me $50 per month, that is what they said to me in the beginning."

Innes, Turner and Willette, the only persons present during any of the negotiations between defendant and plaintiff which the former claims culminated in the execution of the release, each testified that he could understand or speak only a few words of Spanish, though Willette translated the release into Spanish for plaintiff, but Willette says that he "read the whole works" to him in English and "handed it to him to read and he read it. Whether he could or not I do not know but he looked at it." He stated further that plaintiff understood English pretty nearly as well as he did, and the testimony of several other witnesses along the same line was introduced by defendant.

Under this evidence the jury was justified in concluding that plaintiff did not understand the English language, that the release was not read to him in Spanish, and that he did not know the nature of it when he signed it. The plaintiff's statements to this effect were strengthened by the fact that though the witness Willette testified that the two Spanish boys down the hall in the hospital explained the terms of

the release to him in Spanish immediately after the doctor told him in the forenoon of January 3d he could go home as soon as he saw the claim agent and he agreed to its terms by saying in English "that is good," Mr. Innes' testimony was that they discussed the settlement and agreed on $250 as additional consideration for the release *in the afternoon of that day at the claim attorney's office.* Since, under all the evidence, the release had not then been drawn nor according to Mr. Innes' testimony had the amount to be paid as a consideration therefor even been discussed, it is clear that the Spanish boys could not have translated it to plaintiff in the forenoon of January 3d.

Having signed the release under these circumstances, is the plaintiff's right to recover barred? If he knew generally when he signed it what it meant, that its effect was to bar his right to sue, and he was in no way misled or did not know its purport but attached his signature carelessly and with indifference to his rights, it should be upheld. But if, due to his inability to read or understand the English language, he did not know its terms or effect, and the defendant who proposed and prepared it knew that he did not, but notwithstanding this procured his signature to it without causing it to be explained to him in a language he understood, it should not bar his cause of action, because under such conditions it was the duty of the defendant to know that he executed it with a full understanding of its purport, and not permit him to sign it upon the belief that he was merely giving a receipt for further payments for the help of his family during the period of his incapacity. The inability to read or understand English does not, it is true, create a presumption that he does not know the contents of an instrument written in that language and signed by him, but the fact that he cannot do so has an important bearing on the

existence of fraud in securing his signature to it. In 13 C. J. 373 is found this language:

"It has been held that where fraud is alleged it is incumbent on the person relying on the contract to show that it was executed with a full understanding of its terms and effect. Other cases have gone so far as to hold that it is the duty of the person relying on the contract to show that it, or the material parts of it, were read and fully explained to the other party before it was executed and that he fully understood it."

In *Burik* v. *Dundee Woolen Co.,* 66 N. J. L. 420, 49 Atl. 442, the court says:

"Where parties are on equal terms, each must look out for himself; but where one is illiterate, to the knowledge of the other, who tenders for execution a document of whose contents he is cognizant, a duty of adequate explanation rests on him who so tenders it."

See the following: *Butler* v. *Armour Fertilizer Works,* 195 N. C. 409, 142 S. E. 483, 485; Id., 193 N. C. 632, 137 S. E. 813; *Green* v. *Maloney,* 7 Houst. (Del.) 22, 30 Atl. 672; *Suffern and Galloway* v. *Butler,* 18 N. J. Eq. 220; *Spelts & Klosterman* v. *Ward,* 2 Neb. (Unof.) 177, 96 N. W. 56; *Brummond* v. *Krause,* 8 N. D. 573, 80 N. W. 686; *Trambly* v. *Ricard,* 130 Mass. 259; *Melle* v. *Candelora,* (Sup.) 88 N. Y. Supp. 385; *Selden* v. *Myers,* 20 How. 506, 15 L. Ed. 976; *Atlantic Coast Line R. Co.* v. *Adeeb,* 15 Ga. App. 842, 84 S. E. 316.

However, if the interpreter was furnished by the plaintiff and was competent, or incompetent though thought competent by the defendant, the latter's duty to know that the plaintiff understood the terms of the release was discharged when it handed the release to such interpreter for translation, for it would have been justified in relying upon the explanation of the agent selected by the plaintiff himself to acquaint him with the terms and effect of the release. The person

whose interpretation the defendant relies on was Charles K. Willette, but it does not appear from the record that plaintiff requested him to act as interpreter. The record does disclose that the claim agent asked plaintiff to bring an interpreter and that Willette, his brother-in-law, accompanied him to that official's office; but it likewise appears that Willette was an employee of the defendant and that he did not speak Spanish, that he told Turner when the release was executed that he had not translated it to the plaintiff, and that his inability to speak the language well enough to translate an important document of this character must have been known to Innes and Turner. Under these circumstances the jury was justified in concluding that the plaintiff did not ask Willette to interpret the release for him, that he did not do so, and that defendant knew that he did not.

Hence it follows that since the evidence in support of plaintiff's theory of the case disclosed that the defendant procured the plaintiff, an ordinary Mexican laborer who could neither read nor write the English language, who at the time was wholly without means to support his family, and who was so seriously injured that it was practically certain he would never again be able to do hard labor, to execute an instrument for a consideration of $350 releasing it from all liability for the injury it caused him, when it could not show that he fully understood the terms and effect of the paper he was signing, the jury was justified in holding that the execution of the release was procured through fraud in fact, and was therefore without effect. It can hardly be said, under a state of facts such as this case presents, that the parties met on equal terms, and while " 'no presumption of fraud arises from the relation of employer and employee, . . . "it is recognized by the courts that the employer has great influence in determining the conduct of the employee and may use it to his in-

jury."' " *Butler* v. *Armour Fertilizer Works, supra; Engle* v. *American Car & Foundry Co.,* (Mo. App.) 287 S. W. 801.

The gross inadequacy of the consideration paid for the release is an important factor in determining the issue of fraud. The plaintiff was an able-bodied man thirty-nine years of age, and prior to his injury was earning fifty cents per hour or about $100 a month, and in the ordinary course of events had before him a number of years in which to labor, but the evidence discloses that his injury was so serious that he had been able to earn nothing whatever between the date it was received and the day of the trial, a period of twenty-one months, and that because of its seriousness his inability to work at hard labor of any kind will follow him through life, and in addition he will be compelled when walking to endure pain and suffering as long as he lives. The $350 paid for the release compared with the amount the facts suggest as adequate, or with the $6,500 the trial court thought proper, or even with the $1,500 found by the jury, is within the view of any reasonable man grossly inadequate, and under the authorities this fact alone is sufficient to carry the case to the jury on the issue of fraud. *Knight* v. *Vincennes Bridge Co.,* 172 N. C. 393, 90 S. E. 412; *McMahan* v. *Carolina Spruce Co.,* 180 N. C. 636, 105 S. E. 439. In *Butler* v. *Armour Fertilizer Co., supra,* the court quotes approvingly the following language from *Knight* v. *Vincennes Bridge Co.:*

"The owner of tangible property or of a claim for damages may give it away or may sell it for less than its value, and the contract is valid in the absence of fraud, undue influence, or oppression; but if the contract is attacked as fraudulent, the inadequacy of consideration is evidence of fraud, and, if gross, is alone sufficient to carry the case to the jury on the issue of fraud."

The final assignment is that the court erred in granting a new trial for the sole purpose of ascertaining the amount of damages. The new trial itself is not objected to. In fact, a retrial was sought by the defendant and ten alleged errors specified as grounds therefor, but in so far as the order made limits the issues to be retried the defendant vigorously attacks it. Its position is that the question of liability is so connected and interwoven with that of damages that the latter cannot be tried separately without doing an injustice to the defendant, while the plaintiff contends that the matter of liability was settled by the verdict and inasmuch as the evidence discloses that the damages allowed by the jury, $1,500, are so inadequate as to constitute error, it is clear that the court was right in limiting the issues upon the second trial to this one question.

The issue of liability was vigorously contested and the evidence thereon, though conflicting, was such that reasonable men could have taken defendant's view of it. This being true, the smallness of the verdict can be accounted for only upon the theory that it was a compromise on the issues of liability and the amount of damages, because no fair-minded person would contend for a moment that if defendant were liable $1,500 would compensate plaintiff for his loss even during the twenty-one months elapsing between the date of injury and the date of trial, to say nothing of that he will suffer throughout the period of his life expectancy. Since, then, the only inference that can be drawn from the evidence is that certain jurors believed there was no liability at all but consented to a smaller verdict than those jurors convinced of liability desired to return, in order that a verdict might be reached, it follows that the issues of liability and the amount of damages are not separable within the meaning of paragraph

597, Revised Statutes (Civil Code), 1913, which provides that "in case a new trial is granted it shall only be a new trial of the question or questions with respect to which the verdict or decision is found to be wrong, if separable," but are so connected and interwoven that a retrial of the issue of damages alone would be unfair to the defendant. It is true the succeeding paragraph, 598, provides that "when a new trial is ordered because the damages are excessive or inadequate, and for no other reason, the verdict shall be set aside only in respect of damages, and shall stand good in all other respects," yet this does not authorize the court in the exercise of its discretion to grant a new trial of the issue of damages alone when it is clear that a retrial of that issue disassociated from that of liability will not be fair to the defendant.

The court should never permit a party to an action to select for retrial the issues decided against him and upon the rehearing treat those decided in his favor as settled, when the issues are interwoven and cannot be separated without injustice to the other party. As said by the court in *Murray* v. *Krenz*, 94 Conn. 503, 109 Atl. 859, 861:

"The practical difficulty of a rehearing before a new jury, for example, of the issue of damages while retaining the decision of the first jury upon the issue of liability is apparent. Usually these issues will be inextricably interwoven.

"If the verdict be a compromise one—that is, one where some of the jurors have conceded liability against their judgment, and some have reduced their estimate of the damages in order to secure an agreement of liability with their fellow jurors—a new trial confined to the single issue of damages will be a serious injustice to the defendant. He has never had the issue of liability determined by the conscientious conviction of all of the jury. And that he is entitled to have."

See 46 C. J. 77; *Simmons* v. *Fish*, 210 Mass. 563, Ann. Cas. 1912D 588, 97 N. E. 102; *Jarrett* v. *High Point Trunk & Bag Co.*, 144 N. C. 299, 56 S. E. 937; *Doody* v. *Boston & M. R. R.*, 77 N. H. 161, Ann. Cas. 1914C 846, 89 Atl. 487; *Sayegh* v. *Davis*, 46 R. I. 375, 128 Atl. 573.

When liability is conceded or the evidence relative thereto undisputed, it is, of course, clear that the question of damages is separable and can be determined alone without injustice to the other party. The rule which should govern the granting of a retrial of the issue of damages alone is as well stated in *Waucantuck Mills* v. *Magee Carpet Co.*, 225 Mass. 31, 113 N. E. 573, 574, as any we have found. There the court says:

"It is only when the reason for setting aside the verdict relates solely to damages disassociated from every other contributing, related or vitiating cause that 'the new trial shall be limited to the question of the amount of damages alone.' "

Plaintiff cites *Atchison, Topeka & Santa Fe Ry. Co.* v. *Gutierrez*, 30 Ariz. 491, 249 Pac. 66, 67, in support of his contention. This court did order a retrial of the amount of damages only in that case, but it appears in the opinion that it did so because of a faulty instruction relative to the measure of damages which did not affect the general verdict, or, stated in the language of this case, the issue of liability as does the order complained of in the assignment under consideration.

The order of the court granting a new trial is modified by eliminating therefrom that portion limiting the issues to be retried to the amount of damages, and as modified it is affirmed.

ROSS, J., Specially Concurring.—In the main I concur in Mr. Justice McALISTER'S opinion, but I do think the trial court erred in not granting the ap-

pellant's motion for a new trial on the ground of failure of evidence to show negligence. The action was brought under the Federal Employers' Liability Act (45 U. S. C. A., §§ 51–59), which requires that injury of an employee to be actionable must have been the result of negligence. It is not a compensation law placing the burden of accidental injury upon the employer regardless of negligence. If it were, this would be an ideal case for compensation.

An analysis of the testimony of Robles, Dominguez, and the plaintiff as set out in the opinion shows that these three were acting together in lifting platform from the railroad track, and that while so doing, without any negligence on the part of any of them, somehow, some way, the platform was moved towards and against plaintiff, whose foot at the same time slipped, causing him to fall with the platform on him. It seems, according to Robles and Dominguez, the platform slipped as Robles changed his handhold thereon. There is nothing to show that it was negligence for Robles to change his hold. It might have been the necessary and prudent thing under the circumstances. All agree that the platform moved towards plaintiff, and that at the same time his foot slipped causing him to fall. Plaintiff says: "They pushed it on to me. . . . It could not have been so very much of a push." He does not describe the push nor tell how it happened. He does say that co-incidentally his foot slipped and he fell. It would be just as reasonable to say plaintiff was negligent in slipping as to say his coemployees were negligent because they let the platform move in his direction. It is evident the movement of the platform towards plaintiff was very slight, and there is absolutely no evidence that such movement was caused by the negligence of Robles or Dominguez or by their combined carelessness. So far as the evidence is concerned, it shows, in my opinion, that no one was at

fault. It is one of those accidental injuries where the loss must fall on the injured until the lawmakers see fit to change the law. The court cannot change it.

If upon a new trial no negligence is proved, the verdict should be directed for defendant.

LOCKWOOD, C. J., concurs with ROSS, J.