436 P.2d 175

STATE of Arizona, the Arizona Highway Commission, the State Highway Engineer and Deputy State Highway Engineer, Appellants and Cross Appellees,

v.

J. M. WATSON, surviving spouse of Betty Jane Watson, Deceased, for the benefit of himself and minor children and as parent and father of Charm Watson, Deceased, a Minor, Appellee and Cross Appellant,

and

James M. Watson, Jr., by and through his next friend, J. M. Watson, William Hansen, by and through his next friend, Fred A. Hansen, Fred A. Hansen and Nellie Hansen, his wife, and Robert D. Wilson, by his guardian ad litem, Troyce Wilson, and Troyce Wilson, Appellees.

No. 2 CA–CIV 297.

Court of Appeals of Arizona.

Dec. 29, 1967.

Rehearing Denied Jan. 24, 1968.

Review Denied March 5, 1968.

Darrell F. Smith, Atty. Gen., Peter C. Gulatto, Asst. Atty. Gen., for appellants and cross appellees.

Stockton & Hing, by Robert O. Hing and William J. Knudsen, Jr., Phoenix, for appellees Watson and Hansen and cross appellant.

Mackenzie, Scott, Bolze, Weltsch & Moroney, by Albert H. Mackenzie, Phoenix, for appellees Wilson.

MOLLOY, Judge.

This is an appeal and a cross appeal from certain judgments rendered against the State of Arizona for negligence allegedly arising from the construction and maintenance of a narrow bridge on an interstate highway and the failure to post appropriate warning devices on this bridge.

The bridge in question is located on US Highway 60, one mile west of Florence Junction over Queen Creek. The highway in question at the time of the accident was a two-lane highway, with one lane of traffic running east and one west. To the east of the bridge, the traveled portion of the high-

way was wider than the bridge. There was evidence that the highway up until 100 feet east of the bridge was between 36 and 40 feet wide and that it tapered down in the ensuing distance to the 24½ feet width of the bridge. The bridge has concrete abutments approximately 3 feet high on both sides. There was no "narrow bridge" or other sign warning traffic coming from the east of any hazard at this bridge. Near the eastern abutment of the bridge, on the right-hand side of the road, there were two metal reflectors, but these were set back to the right side of the abutment, a distance of approximately 2½ feet. The abutment of the bridge itself was not striped nor marked with reflectors. There were no lines painted on the pavement to denote a narrowing of the road nor were there any guard rails at the approach to the bridge. The bridge was not lighted.

At approximately 11:20 p. m., on the night of the accident, a westbound vehicle driven by one Williamson hit the eastern abutment of the bridge a glancing blow and bounced into the eastbound lane where, in the middle of the bridge, it collided head-on with an eastbound car driven by Betty Jane Watson. In the car driven by Mrs. Watson, there was one other adult and six children as passengers. Both drivers and one of the children, Charm Watson, died as a result of the accident.

This action concerns the wrongful death claims pertaining to the death of Mrs. Watson and Charm Watson, brought by J. M. Watson as surviving spouse and father, and the personal injury actions of the adult passenger, and of three of the minors who were injured in the accident. A jury verdict was rendered below in favor of all of the plaintiffs and against the defendant. There is no question as to the amounts of these verdicts presented on appeal, with the exception of the verdicts rendered in favor of J. M. Watson as surviving spouse

and father. These are attacked in the cross appeal as being grossly inadequate.

The first contention made by the State as to why all judgments should be reversed is that the trial court held the defendant to a "greater duty other than to maintain the highway reasonably safe for travel." Under this section of its brief, the State argues there was not sufficient evidence for the jury to have found that the situation created by the State at the Queen Creek Bridge was not reasonably safe for travel. An examination of the record convinces us to the contrary.

The Manual of Uniform Traffic Control Devices published by the Public Roads Administration of the United States Government, August 1948 edition, was admitted in evidence without objection. This manual required a "narrow bridge" warning sign for all bridges "having a roadway clearance less than the width of the approach pavement."[1] This manual also requires that all culvert headwalls be marked with a "diagonal stripe design" of alternating black and white paint[2] and that hazard markers be mounted "on or immediately in advance of obstructions * * * to indicate the presence of hazards."[3] All of these safety rules were violated in connection with the approach to this bridge. There was testimony from a traffic-control engineer, given without objection, that the failure to post warning signs and reflectors in connection with this bridge "constituted a serious hazard to motorists traveling on that highway."

Since the decision of Stone v. Arizona Highway Commission, 93 Ariz. 384, 381 P.2d 107 (1963), the State is held liable for its negligence in the maintenance of highways. While *Stone* does not expressly set forth the standard of care to which the State is obligated, we have numerous decisions in this jurisdiction declaring the standard of care owed by a munici-

---

1. Manual of Uniform Traffic Control Devices § 78, at 47 (1948).

2. Id. §§ 151 and 154, at 97 and 99.

3. Id. § 156, at 99.

pality. We see no reason to apply a different standard to the State than to a municipality. We find sufficient evidence to go to the jury on the question of whether the State failed to maintain this particular highway in a reasonably safe condition. City of Phoenix v. Camfield, 97 Ariz. 316, 400 P.2d 115 (1965).

■ The State also argues obliquely under this section of its brief that the decision as to what highway warning signs are to be posted is a "discretionary" power vested in the State under A.R.S. § 28–642, subsec. A,[4] and that it therefore has immunity from liability for its decisions in this regard. The statute in question does require the Commission to place such traffic-control devices "as it deems necessary" to warn or to guide traffic. However, we see no intent in this statute to grant an immunity to the State. While we recognize the power of the State to grant immunity to itself or its subdivisions as to tort liability, Turner v. Superior Court, 3 Ariz.App. 414, 415 P.2d 129 (1966), if it wishes to exercise its sovereign powers in this regard, it must spell out its intent. The granting of immunity from a common right will not be lightly implied. See 50 Am.Jur. Statutes § 398, at 422–23; 82 C.J.S. Statutes § 393, at pp. 938–939.

Nor do we see any "common law" immunity such as was found by the Supreme Court of Washington to be reposed in the State against a charge of negligence in selecting the type of custodial care to be provided delinquents. Evangelical United Breth. Church of Adna v. State, 67 Wash. 2d 246, 407 P.2d 440 (1965). In that case, the Washington Supreme Court found that decisions made by the State as to the type of institutions that would be provided delinquents " * * * are not unlike those called for in the legislative and judicial processes of government." 407 P.2d at 447. This opinion carries with it a strong dissent. The majority recognize that the State would be liable if it negligently failed to report to law-enforcement officials the runaway of a dangerous delinquent, providing such failure to report were the proximate cause of injury. This type of function is labeled by the court as " 'operational,' " " 'ministerial,' " or " 'housekeeping' " (407 P.2d at 447). We would speculate that even the majority of the court in Washington would regard the posting of proper warning devices at a narrow bridge to be "ministerial," and not within the immunity established by this decision.

The next attack of the State is directed at the alleged lack of connection between the failure to give warning as to this bridge and the accident which resulted in the plaintiffs' injuries. This argument revolves largely around the fact that when Williamson was taken from his car, there was the odor of alcohol on his breath. It is contended that his negligence was the superseding cause of this accident and that this court should rule as a matter of law that any negligence of the State could not have been a cause of the plaintiffs' injuries.

■■ The negligence of the State need not be the only cause of this accident. It is sufficient if it is *one* of the proximate causes. Beltran v. Stroud, 63 Ariz. 249, 254, 160 P.2d 765, 767 (1945). An intervening cause is not a superseding cause, so as to give immunity to a defendant whose negligence occurred before the intervening event, if the first tort feasor should reasonably have foreseen the risk entailed in the possibility of the subsequent conduct. MacNeil v. Perkins, 84 Ariz. 74, 324 P.2d 211 (1958); City of Phoenix v. Schroeder, 1 Ariz.App. 510, 405 P.2d 301 (1965).

■ That all drivers upon our highways are not completely sober and wide-awake is

---

4. A.R.S. § 28–642, subsec. A reads:
 "The commission shall place and maintain such traffic-control devices, conforming to its manual and specifications, upon all state highways as it deems necessary to indicate and to carry out the provisions of this chapter or to regulate, warn or guide traffic."

an unfortunate but notorious fact. Alert drivers in large numbers negotiated Queen Creek Bridge on this night and on many other nights sans warning devices and sans accident. But, it is certainly foreseeable that occasionally a marginally alert, or worse, driver would travel this highway and come to this bridge at a time when the lights of an oncoming car would make it difficult to appreciate that there was a concrete abutment 100 feet directly ahead in a traveled portion of the highway. With no warning sign being posted to warn approaching drivers of this situation and without reflective devices on that portion of this abutment presenting the most danger, it is understandable that an accident such as this has occasionally occurred at this bridge.[5] We hold there was a question of fact for the jury to determine as to whether any negligence of the State was a proximate cause of this accident. City of Phoenix v. Camfield, 97 Ariz. 316, 400 P.2d 115 (1965).

The third attack made upon the judgments is that the court erred in the admission of evidence. Complaint is made of the admission of the Manual on Uniform Traffic Control Devices, June 1961 edition. The evidence establishes that this manual was prepared by the National Joint Committee on Uniform Traffic Control Devices and that this joint committee consisted in part of the American Association of State Highway Officials.

 There was testimony in the record that this manual had been adopted by the national committee in June of 1961 and made available to interested agencies at that time. This accident occurred on March 23, 1962. After the admission of the manual, over objection, there was testimony from one of defendant's expert witnesses that this manual was a "guide line" in this country. We believe it to be proper to consider this subsequently developed foundation to as-

certain whether it was reversible error to admit this exhibit. Western Truck Lines Ltd. v. Berry, 52 Ariz. 38, 78 P.2d 997 (1938).

Applicable statute requires that the Arizona State Highway Commission adopt a manual for a uniform system of traffic-control devices and that this uniform system " * * * shall correlate with and so far as possible conform to the system then current as approved by the American Association of State Highway Officials." A.R.S. § 28–641. There is no question raised on appeal but what the manual admitted in evidence was the system designated by this statute, but the contention is made that the Arizona Highway Commission did not adopt this version of the manual until July of 1962, some 4 months after the accident in question, and hence that it was not affected by it at the time of the accident.

 We hold the admission of this manual was proper, under either one of two theories: (1) as evidence of standard custom or usage in this country, to be considered by the jury in connection with its determination of whether the State used ordinary care in this specific instance, see Fluor Corp. v. Black, 338 F.2d 830, 832 (9th Cir. 1964), and American Smelting & Refining Co. v. Wusich, 92 Ariz. 159, 375 P.2d 364 (1962); or (2) as evidence that the State failed to meet the safety standards set for itself by the enactment of A.R.S. § 28–641. This latter purpose is grounded on the hypothesis that the jury may have determined the State Highway Commission had not conformed its traffic-control system "so far as possible" with the system "then current" with the American Association of State Highway Officials. Generally, safety regulations adopted by a defendant for its own guidance are admissible in evidence. Bryan v. Southern Pacific Co., 79 Ariz. 253, 260, 286

5. There is evidence in this record that a similar accident had occurred approximately 15½ months prior to the accident in question.

P.2d 761, 50 A.L.R.2d 1 (1955); and see 29 Am.Jur.2d Evidence § 445, at 504–05.[6]

The State also complains of the admission of testimony from a traffic engineer called by the plaintiffs as a witness to the effect that this bridge and its accompanying lack of warnings "* * * did not constitute good practice engineering or design" and that it did not comply with the June 1961 manual. This witness was amply qualified in the field of traffic engineering and the subject is sufficiently abstruse so that his testimony may have been of some assistance to the trier of fact. We see no error in the admission of this testimony. Atchison T. & S. F. Ry. Co. v. Parr, 96 Ariz. 13, 18, 391 P.2d 575 (1964); MacNeil v. Perkins, 84 Ariz. 74, 87, 324 P.2d 211 (1958); and see Udall, Arizona Law of Evidence § 21.

The foregoing disposes of all contentions raised by the State on appeal, and we proceed to consideration of the cross appellant's contention that the amounts awarded for the death of the wife and child, $1,000 each, were inadequate. Undisputed facts indicate Mrs. Watson at the time of her death was 39 years of age and Charm was 12. Mr. and Mrs. Watson had one other child, a 9-year old son, who was seriously injured in this same accident.

The wrongful death action brought as to Mrs. Watson is for the benefit of both the surviving spouse and the surviving son. A.R.S. § 12–612. Our statute is a Lord Campbell's type of statute, and creates a new cause of action for damage sustained by the survivors. In re Estate of Milliman, 101 Ariz. 54, 415 P.2d 877 (1966).

There was testimony from Mr. Watson, unrefuted in the record, that he and his wife had been happily married for 13 years, and that his wife kept a good home and was a loving and attentive mother. According to Mr. Watson, Charm was a bright child,

earning A's and B's in school, in good health, and active in sports. Charm's teacher confirmed that she was a bright, energetic, and cooperative child. The record indicates that Mrs. Watson's medical, hospital and funeral bills resulting from the subject accident totaled $818.37, while the funeral bill for the daughter was $593.12. There is no contention made that these items are not proper elements of damage in these wrongful death actions.

The law in this state is that a verdict of a jury as to the amount of damage will not be disturbed by the court unless it "* * * shock the conscience * * *" of the court. Stallcup v. Rathbun, 76 Ariz. 63, 66, 258 P.2d 821, 824 (1953). In this case, the trial court has passed upon a motion for new trial based on inadequacy of damage and has denied it. An appellate court is very reluctant to disturb the exercise of discretion by the trial court in granting or denying a new trial. Caldwell v. Tremper, 90 Ariz. 241, 367 P.2d 266 (1962); Garcia v. City of Tucson, 1 Ariz. App. 83, 399 P.2d 704 (1965).

We are dealing with an intangible as to which there can be no unanimity of opinion. At first blush, and now on reflection, this court is shocked by the small amount of these verdicts. Our Supreme Court has said that in a wrongful death action such as this, the jury should consider "loss of companionship, comfort and guidance." Boies v. Cole, 99 Ariz. 198, 203, 407 P.2d 917, 920 (1965). Surely, these items in the case of the loss of this wife and mother have a value of more than $181.63. And, surely, the loss of this child to her surviving father cannot be approximated at $406.88. In Southern Pacific Co. v. Barnes, 3 Ariz.App. 483, 415 P.2d 579 (1966), this court approved an award of $35,000 for the loss of an 11-year old daughter whose scholastic accomplishments may have been slightly higher than those of

---

6. We do not determine, because it is unnecessary for the decision here, whether a violation of such standards after adoption by the Arizona Highway Commission would be negligence per se. See Serrano v. Kenneth A. Ethridge Contracting Co., 2 Ariz.App. 473, 475, 409 P. 2d 757 (1966).

Charm, but whose life was otherwise comparable.

■ We find decisions cited by the State approving damage awards similar to those awarded here for wrongful death to be distinguishable. Most cited decisions are from states providing for recovery for damages to the estate of the deceased and not for damage to the survivors. Our law has imposed a greater burden upon a tort feasor causing a wrongful death. While complete uniformity in verdicts can never be achieved, there must be some limits to the unevenness that will be tolerated. In our view these verdicts are outside of the tolerable limits and must be set aside.

■ The State has contended that if a new trial is to be granted, it should be granted as to all issues, reliance being taken upon Southern Pacific Co. v. Gastelum, 36 Ariz. 106, 283 P. 719 (1929), in which our Supreme Court said, in part:

"The court should never permit a party to an action to select for retrial the issues decided against him and upon the rehearing treat those decided in his favor as settled, *when the issues are interwoven* and cannot be separated without injustice to the other party." (Emphasis added) 36 Ariz. at 125, 283 P. at 725.

In support of this statement, our Supreme Court quoted with approval from Murray v. Krenz, 94 Conn. 503, 109 A. 859, 861, in part:

"If the verdict be a compromise one— that is, one where some of the jurors have conceded liability against their judgment, and some have reduced their esti-

mate of the damages in order to secure an agreement of liability with their fellow jurors—a new trial confined to the single issue of damages will be a serious injustice to the defendant. He has never had the issue of liability determined by the conscientious conviction of all of the jury And that he is entitled to have."

We regard this apprehensiveness of a compromise verdict to be the principal reason for the decision in *Gastelum,* and we find this reason lacking here. A jury has decided without equivocation the question of liability here presented. The claims of the surviving plaintiffs which were tried along with these wrongful death actions resulted in very substantial verdicts, the amounts of which are not questioned on appeal.[7]

Also influencing our decision is the categorical statement now contained within Rule 59(i) (1), R.Civ.P., 16 A.R.S., that:

"If the conditional order of the court requires a reduction of or increase in damages, then the new trial will be granted in respect of the damages only and the verdict shall stand in all other respects."

■ The above provision was added to our Rules of Civil Procedure by our Supreme Court by an amendment effective November 1, 1967. We believe that it indicates a change in attitude[8] of our Supreme Court on what we regard to be a procedural question. Unless the application of the amended rule is not feasible or would work an injustice, we believe it has application to a pending action. See Rule 81, R.Civ.P., 16 A.R.S.; and cf. United States v. Back-

7. The adult surviving passenger recovered $35,000; James M. Watson, Jr., recovered $75,000 for his personal injuries; and another minor-plaintiff was awarded $100,000 for personal injuries and his father was awarded $10,000 for medical expenses.

8. The comparable provision of the old rule read:
"2. When the motion for new trial is made on the ground that the damages

are inadequate or insufficient, the court may order that a new trial be denied if both parties consent that judgment be entered for such amount as the court deems adequate and sufficient, otherwise a new trial will be granted."
Rule 59(i), R.Civ.P., 16 A.R.S.

·ofen, 176 F.2d 263 (3d Cir. 1949); and Lockwood v. Hercules Powder Co., 172 F.2d 775 (8th Cir. 1949).

While the new Rule 59(i) specifically gives authorization for a conditional additur, we are in the handicapped position of not having heard or seen the witnesses. Because of the intangible nature of these damages, we do not believe it appropriate for this appellate court to now enter a conditional additur order. When damages are completely unliquidated, as here, our Supreme Court has taken the view that it is not appropriate for it to invoke its remittitur powers. Hirsh v. Manley, 81 Ariz. 94, 300 P.2d 588 (1956); and see Gilliland v. Rodriquez, 77 Ariz. 163, 268 P.2d 334 (1954). While we have no doubt that this court does possess the power to enter a conditional remittitur or additur order in appropriate circumstances, Griffen v. Stevenson, 1 Ariz.App. 311, 402 P.2d 432 (1965), we believe it would be judicial indiscretion to do so here.

For the reasons stated the judgments rendered below are affirmed except the judgments in the wrongful death actions and these are reversed for new trial on the issue of damages only.

HATHAWAY, C. J., and KRUCKER, J., concur.