407 P.2d 917

L. C. BOIES, Sheriff of Maricopa County, Arizona, and Trinity Universal Insurance Company, a corporation, Appellants and Cross-Appellees,

v.

Eva Mae COLE, surviving spouse of Lewis Pearl Cole, deceased, and mother of Dolores May Nadias, Doris A. Cole, Charles W. Cole, and Lewis R. Cole, suing herein for and on behalf of herself and the above-named minor children, Appellees and Cross-Appellants.

No. 7530.

Supreme Court of Arizona.

En Banc.

Nov. 17, 1965.

Rehearing Denied Dec. 14, 1965.

Beer & Polley, Phoenix, for appellants and cross-appellees.

Moore & Moore, Phoenix, for appellees and cross-appellants.

BERNSTEIN, Justice.

Appellants and cross appellees were defendants in a wrongful death action brought pursuant to A.R.S. § 12–613. They are the Sheriff of Maricopa County and the surety company that wrote his bond. Appellees and cross appellants, plaintiffs in the action, are the surviving spouse and children of the deceased husband and father. Plaintiffs received a verdict of $10,000 against both defendants. On motion for new trial the trial judge ordered a remittitur of $7,-000 or in the alternative a new trial. Defendants appeal from the judgment and plaintiffs appeal from the order of remittitur. Tony Silvio, one of the defendants in the trial court and the person who fired the shot that killed decedent, did not appeal.

█ The trial judge by his order of remittitur approved the verdict of the jury as to liability. Consequently we must consider the evidence and the inferences to be drawn from the evidence in the light most favorable to the plaintiffs. LeRoy v. Phillips, 97 Ariz. 263, 399 P.2d 669.

For some years prior to November 15, 1957, the defendant Tony Silvio had been under contract with the Maricopa County Board of Supervisors to supply ambulance service for the Maricopa County Sheriff's office. The contract was let on public bids and provided for the furnishing of ambulance services. The ambulances were to answer calls "at point of pickup" upon request of the Maricopa County Sheriff's office. The ambulance service included the "handling of prisoners and detention cases and the movement of county patients from place to place on appointment basis or telephoned demand." Silvio was paid on a time and mileage basis by the Board of Supervisors. He was paid in part out of the sheriff's budget.

On November 15, 1957, plaintiff wife of Lewis Pearl Cole filed a petition asserting her husband was dangerous to himself and to others and a detention order was issued by the Superior Court pursuant to A.R.S. § 36–504, now § 36–511, and delivered to the sheriff's office. About 6:30 that evening, a deputy sheriff was sent to the Cole home in Phoenix, Arizona. Silvio was handed the court order at the sheriff's office and went from there to the Coles where he met a deputy sheriff. Upon inquiry, it developed that Cole was not at home but had gone to a movie and was expected back in two or three hours. Silvio waited for Cole and twice called Sergeant Barnes who was in charge of the mental health department of the sheriff's office. He asked that he be allowed to pick up the deceased the next morning. He was told by Barnes to wait for Cole because "we have got to pick him up tonight. He will kill his wife if you don't." At about 10:00 p. m. Silvio returned to the Cole home as instructed by Barnes. Silvio advised Cole that he had come to take him into custody to be delivered to the County Hospital. Cole refused to go with Silvio and Silvio then attempted to take him by force by placing handcuffs on him. In the resulting struggle Cole was shot and killed by Silvio.

█ Appellants contend that Silvio was not a deputy sheriff of Maricopa County and this is the first question for our decision. Silvio answered calls at "point of pickup". He had been doing this for four years in cars on which was painted a sheriff's star. He testified:

"A Yes, sir, it sure did. It had a sheriff's star on each side of the car.

"Q That is the Sheriff of Maricopa County insignia on it?

"A That's right.

"Q How long had you used the car with that marking on it before Mr. Cole met his death?

"A   Well, that car in particular I think I had used it about six months.

"Q   Had you used other cars that had that marking on them?

"A   Yes, I have.   I had a Hudson."

In the car he had a radio over which he received orders from the sheriff's department to "pickup" people and he had received orders over the radio from the sheriff's department to go to the Cole house at other times:

"Q   Yes.   You said that you got a radio call on the air?

"A   That's correct.

"Q   Who did you get the radio call from?

"A   From the Sheriff's office."

He also used his radio on the night of the shooting to inform the sheriff's department of the incident.

Silvio was issued a deputy sheriff's card which read "I. L. C. Boies Sheriff of Maricopa County, State of Arizona do hereby constitute Tony Silvio *my lawful deputy in all matters to act as if myself were present.*"   This card also had the words "Ambulance Service" typed in.   Taking this evidence in the light most favorable to the plaintiff he was authorized to act as a "lawful deputy in all matters" as if he were the sheriff.   The argument that his authorization was limited to "ambulance service" is not material as he was performing that function.

The testimony shows that Silvio had been ordered by the sheriff's department to "pickup" people for four years prior to the shooting in this case.   Two of the definitions of "pickup" in Websters Third New International Dictionary are:

Pickup "5 b to find or come upon and take into custody [picked up by the police for questioning].

Pickup "E.   ARREST"

Taking, as we must, the definition of "pickup" most favorable to the plaintiff, Silvio had been arresting people on order of the sheriff's department for four years.

In addition Silvio had in his possession a commitment order for the arrest of the deceased which could only be served by an officer of the law.   A.R.S. § 36–504, now § 36–511.   He testified:

"A   So I walked up to Mr. Cole and I says 'You are Mr. Cole?'   He said, 'Yes.'   And I says, 'I have a court order from the Superior Court to take you to the County Hospital for medical examination.'"

Viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the plaintiff, defendant Silvio:

1.   Was known by the sheriff to have a sheriff's star on his ambulance.

2.   Had a radio in his car over which he was given instructions to pick up people.

3. Had a deputy sheriff's card issued by the sheriff under his hand authorizing him to make arrests as a deputy sheriff.

4. Had arrested people pursuant to court order on the instructions of Sergeant Barnes head of the Mental Health Department of the sheriff's office.

5. Arrested the deceased pursuant to court order and instructions from Sergeant Barnes.

In State v. Stago, 82 Ariz. 285, 288–289, 312 P.2d 160, we said:

"In the instant case, the Sheriff of Navajo County testified that he had appointed Dillon as a deputy sheriff and issued to him a card confirming the appointment. This is sufficient compliance with the statute that 'appointments shall be in writing.'

\* \* \* \* \* \*

"As noted, the written appointment of Dillon as deputy sheriff was not recorded as is required by the statute. However, such statutes have often been construed as directory so that in any event his acts were valid as a de facto officer. 43 Am.Jur. 234, Public Officers, Section 483. It has been specifically held that the failure of a deputy sheriff to qualify by filing his appointment and oath of office, as required by the statute, did not deprive him of de facto status."

Silvio's status as a deputy sheriff here is even more clear than that in Stago. In Stago the Board of Supervisors approved a bond. Here the Board of Supervisors employed and paid Silvio in part out of the sheriff's budget for his services. The sheriff appointed Silvio a deputy sheriff, permitted the use of a sheriff's identification shield on his ambulance, delivered court orders for arrests into his hands, directed him to make pickups over the sheriff's radio and issued a deputy sheriff's card to him. This evidence is sufficient to support the jury's finding that Silvio was a deputy sheriff.

■ Defendants also contend that the trial judge erred in instructing the jury that they could assess punitive damages pursuant to A.R.S. § 12-613 in that the section does not provide for punitive damages in a wrongful death action; that punitive damages cannot be assessed against a sheriff arising from the conduct of his deputy unless authorized or participated in and that a surety on a sheriff's bond cannot be made to respond in punitive damages. Appellees contend that the instruction complained of did not allow the jury to assess punitive damages.

A.R.S. § 12-613 reads in part:

"In an action for wrongful death, the jury shall give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover, and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default."

The question for our determination here is whether the language of this statute makes allowance for punitive damages in wrongful death actions. In Downs v. Sulphur Springs Valley Electric Coop., 80 Ariz. 286, 297 P.2d 339, we held that the predecessor of this statute did not provide for punitive damages. We said:

"Since our statutes at one time expressly allowed exemplary damages and thereafter it was eliminated, we must say there can be no implication that the present statute confers the right to this kind of damages in a death action. It shows a clear intention of the legislature to not allow the same." 80 Ariz. at 292, 297 P.2d at 342–343.

And again:

"The general rule is that unless the statute expressly or by clear implication confers the right to such exemplary damages, none can be recovered in an action for wrongful death." 80 Ariz. at 292, 297 P.2d at 342.

Downs was decided in May 1956, and A.R.S. § 12–613 was amended by the state legislature in its present form as quoted above in July 1956. Downs did not construe the provisions of the present act.

We read the wrongful death statute, §§ 12–611 and 12–613, as being in two parts. First, damages shall be those that are "fair and just".

The wrongful death act of 1901 amending the act of 1887 read in part:

"In an action for wrongful death, the jury shall give such damages as it deems fair and just, and the amount recovered in such action shall not be subject to debts or liabilities of the deceased."

This language was interpreted as allowing damages to the estate but not to allow damages to the next of kin. Southern Pac. Co. v. Wilson, 10 Ariz. 162, 85 P. 401. Only pecuniary damages could be recovered, Butler v. Rule, 33 Ariz. 460, 265 P. 757.

In 1956 the wrongful death statute was again amended so that damages were awarded as were fair and just "with reference to the injury resulting from the death *to the surviving parties who may be entitled to recover."*

Thus, the compensation which is to be awarded under the 1956 amendment is measured by the injury to the surviving parties. The measure of damages is no longer limited to pecuniary damages, but also includes allowance for such things as loss of companionship, comfort and guidance. Merritt-Chapman & Scott Corp. v. Frazier, 289 F.2d 849, 858 (1961) cert. denied 368 U.S. 835, 82 S.Ct. 60, 7 L.Ed.2d 36 in interpreting A.R.S. § 12–613 said:

"The Arizona wrongful-death statute broadly provides that 'fair and just' compensation may be awarded by the jury to the surviving parties who may be entitled to recover. Sec. 12–613, Ariz.Rev.Stat. Under this statute, the

jury was permitted, as the Court instructed, to include in its verdict not only a 'fair and just' allowance for the actual pecuniary loss sustained by the widow and each of the several children, but also a like allowance for such non-pecuniary elements of damage as loss of companionship, comfort, and guidance that Frazier would have probably provided to them."

Second, the jury in assessing damages shall also have " * * * regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default." A.R.S. § 12-613.

Defendants point to Moffatt v. Tenney, 17 Colo. 189, 30 P. 348, 351 which construed the words mitigating or aggravating in the Colorado Wrongful Death Statute as allowing only compensatory damages.

On the other hand Missouri interprets the words mitigating or aggravating as providing for comparative negligence under the Missouri wrongful death statute. Martin v. Sloan, Mo.Sup., 377 S.W.2d 252; Richeson v. Hunziker, Mo.Sup., 349 S.W. 2d 50.

The 1956 amendment to the Arizona wrongful death statute provided that the jury could take into account the "mitigating or aggravating circumstances attending the wrongful act * * *." These words of the amendment coming hard on the heels of our decision in Downs must be closely examined in determining the intent of the legislature. Ernst v. Collins, 81 Ariz. 178, 302 P.2d 941.

The phrase "mitigating or aggravating circumstances *attending the wrongful* act * * *" would have to be an element of damages created by the legislature in addition to those considered to be "fair and just". The word "aggravating" modifies the words "wrongful act * * *" and is a clear implication that the element of damages added by the amendment are punitive damages. As this court said in Lutfy v. R. D. Roper & Sons Motor Co., 57 Ariz. 495, 503-504, 115 P.2d 161, 165:

"The general rule is that 'the allowance of exemplary or punitive damages is based on *aggravated*, wanton, reckless, or maliciously intentional wrongdoing.'" (Emphasis supplied).

And the term "aggravating circumstances in the act" in a statute has been held specifically to authorize punitive damages. Battle v. Kilcrease, 54 Ga.App. 808, 189 S. E. 573.

We hold that the use of the words "aggravating circumstances" as applied to the wrongful death act is a clear implication of legislative intent to allow punitive damages in wrongful death actions.

· We now come to the meaning of the term "mitigating circumstances". As with the word "aggravating" the word "mitigating" modifies the words "wrongful act * * *" rather than the words "fair and

just". Indeed, if it were held to modify "fair and just" it would allow the jury to award damages less than fair and just and would create a system of comparative negligence in wrongful death actions. In this state by Art. 18, Sec. 5 Arizona Constitution, A.R.S., we are committed to the doctrine of contributory negligence. And the doctrines of contributory negligence and comparative negligence are not compatible. As was said in St. Louis & S. F. R. Co. v. Elsing, 37 Okl. 333, 132 P. 483, 486:

> "We are forced to this conclusion by the language of the instruction itself, especially the last sentence thereof, which provides that the negligence of the plaintiff may be considered by the jury in *mitigation* of damages, which in effect means that the jury may weigh and apportion the concurring acts of negligence of both plaintiff and defendant. The jury under this instruction, to say the least, were inferentially, or impliedly, given authority to determine the degree of negligence of both parties and to apportion the same between them in order to correctly estimate the amount of plaintiff's recovery, and they were thereby in effect told that the defendant was not entitled to its defense of contributory negligence which is granted to it, and to all other litigants, under our Constitution and laws. This instruction is therefore erroneous and does not state the law in

this state, for here there can be no recovery by a plaintiff who is guilty of contributory negligence." (Emphasis supplied).

In Arizona contributory negligence of the slightest degree if it is a proximate cause of the accident "may" or "should" defeat recovery by a plaintiff and we have recently reaffirmed the Arizona rule on contributory negligence in Layton v. Rocha, 90 Ariz. 369, 368 P.2d 444; Lutz v. Faith, 95 Ariz. 40, 386 P.2d 85.

Mitigating circumstances can only apply where there have been such aggravating circumstances as to justify an award of punitive damages and may only be shown to mitigate the amount of such punitive damages. For instance, where punitive damages are proper, provocation on the part of the deceased may be an element to be considered by the jury as diminishing the amount of punitive damages they might otherwise assess on account of the aggravating circumstances attending the wrongful act. Baltimore & O. R. Co. v. Barger, 80 Md. 23, 30 A. 560, 26 L.R.A. 220.

We agree with appellant's contention that no punitive damages may be assessed against the defendant sheriff. A sheriff may not be held for punitive damages for the acts of his deputy unless he has directed, participated in, acquiesced or ratified those acts. There is no evidence here that the sheriff in any way directed,

participated in, acquiesced or ratified the killing of decedent. Ross v. Sweeters, 119 Cal.App. 716, 7 P.2d 334.

> "* * * while the sheriff and his bondsmen would be liable for compensatory damages, they would not be liable for punitive or exemplary damages, unless they had knowledge of the conduct of the agent and had acquiesced in or ratified his actions." 7 P.2d at 338.

Appellees contend that the instruction to the effect that the fair and just damages could be aggravated was not an instruction allowing punitive damages. In view of what we have said before we find this argument without merit. So long as the sheriff cannot be held for punitive damages in this case neither can his surety be liable for such damages.

Appellant also complains of the instructions of the trial judge on the measure of fair and just damages. We have treated fully the proper measure of damages under A.R.S. § 12–613 and the subject of damages needs no further discussion.

Also appellees' cross-appeal need not be discussed as it complains only of the remittitur and any error that may have been committed will be cured by a new trial.

One further matter remains to be disposed of in this appeal. As stated, the defendant Silvio did not make an appearance in this Court either as appellant or as an appellee in answer to the cross-appeal of Eva Mae Cole. We, therefore, assume that as to Silvio the court erred in granting a new trial on the ground that Eva Mae Cole failed to file the remittitur. It is ordered that the judgment in favor of cross-appellant against Tony Silvio be reinstated in the sum of $10,000.

Judgment granting a new trial affirmed as modified.

UDALL, J., concurs.

LOCKWOOD, Chief Justice (specially concurring):

I concur in the result of the majority opinion and with the reasoning therein, except for the significance attributed to the word "pickup". In that regard, it appears to me that it cannot be considered a word of art in the present case. Certainly in police language, the word "pickup" may be used to denote an arrest for various purposes. However, it may also be used in connection with transporting persons in need of ambulance service from any point found (including from the county jail, after an arrest has already been made) to the county hospital. This would not involve an arrest on the part of Silvio, although he would *"pick up"* the patient who was already under arrest to drive him to the hospital in connection with his ambulance service duties.

As pointed out in the majority opinion, there is ample evidence without regard to the use of the word "pickup" which would indicate that Silvio's status was that of a deputy sheriff, even though it involved special ambulance services.

STRUCKMEYER, Vice Chief Justice (dissenting).

I am dissatisfied with the treatment by the majority of the serious questions raised in this appeal in holding that the Sheriff of Maricopa County, L. C. Boies, and the Trinity Universal Insurance Company are liable in damage for the death of Lewis Pearl Cole.

The basic facts giving rise to this action are relatively simple. At about the hour of 10:00 p. m. on November 15, 1957, Tony Silvio attempted to take into custody and transport Cole to the Maricopa County Hospital. Prior thereto, at the instigation of Cole's wife, an order had been issued by the Superior Court of Maricopa County pursuant to A.R.S. § 36–501 et seq. (amended by Laws of 1958) for detention of Cole in the county hospital as a mentally ill person. Silvio advised Cole that he had come to take him to the county hospital but Cole refused to go with him. Thereafter, in the language of Eva Mae Cole, plaintiff and wife, Silvio said:

"'I'll take you one way or another if I have to kill you,'"

Then:

"and just that quick he drawed out his gun and while he was doing that my husband stepped back a little and he shot him, and he fell, and then Mr. Silvio ran out of the door and he never came back, * * *."

But, the fact of this unnecessary killing should not be allowed to cloud the issue as to where liability for damages should be placed.

Three theories are suggested by the evidence as possible grounds of liability of Boies. They must be separately considered in order to properly analyse the responsibility for what occurred and should not be lumped together to support a judgment which is attacked as contrary to the law and evidence.

FIRST: Only if Silvio was a duly appointed, qualified and acting deputy sheriff of Maricopa County as pleaded in plaintiff's complaint would Sheriff Boies and his bonding company be liable. Miles v. Wright, 22 Ariz. 73, 194 P. 88, 12 A.L.R. 970.

The plaintiff, Eva Mae Cole, alleged in her complaint for the wrongful death of her husband

"that defendant Tony Silvio at all times herein mentioned was and now is a duly appointed, qualified and acting deputy sheriff in Maricopa County, Arizona."

This allegation was never amended ¦either at the trial or later. *In the end, therefore, plaintiff's case against Sheriff Boies and the Trinity Universal Insurance Company must rest or fall on the establishment of the fact that Silvio was a duly appointed, qualified and acting deputy sheriff.*

. The burden of proving agency rests upon the party asserting it. Cameron v. Lanier, 56 Ariz. 400, 108 P.2d 579; United States Smelting, Refining and Mining Exploration Company v. Wallapai Mining and Development Company, 27 Ariz. 126, 230 P. 1109. It was plaintiff's burden to establish Silvio's agency as a duly appointed and qualified deputy sheriff. In this respect the proof wholly fails.

A.R.S. § 11–409. provides that county officers " * * * may, by and with the consent of, and at salaries fixed by the board [of supervisors], appoint deputies, * * *. The appointments shall be in writing, and filed in the office of the county recorder."

The statute, on its face, requires these elements:

1. An appointment in writing;

2. The appointment be with the consent of the Board of Supervisors; and

3. That it be filed in the office of the county recorder.

A.R.S. § 11–409 is a public policy. statute. Its purpose is to prevent county officials from indiscriminately. employing persons to exercise the functions of an office. While a public officer has a right to determine who shall be his deputies, Thomas v. Whatcom County, 82 Wash. 113, 143 P. 881, the acts evidencing the legality of the appointment must be present; otherwise, the statute would be meaningless.

The evidence established that Silvio was issued the card here reproduced.

AMBULANCE SERVICE
MARICOPA COUNTY    STATE OF ARIZONA

DEPUTY        SHERIFF

*Know all men* TONY SILVIO WHOSE SIGNATURE AND PHOTO APPEAR HEREON HAS BEEN REGULARLY APPOINTED DEPUTY SHERIFF OF MARICOPA COUNTY FOR 1957-1958

L. C. BOIES, SHERIFF    PHOENIX, ARIZ.

STATE OF ARIZONA } ss.
COUNTY OF MARICOPA

KNOW ALL MEN BY THESE PRESENTS:

THAT I L. C. BOIES
SHERIFF OF MARICOPA COUNTY,
STATE OF ARIZONA, DO HEREBY CONSTITUTE AND APPOINT

*Tony Silvio*

MY LAWFUL DEPUTY IN ALL MATTERS, TO ACT AS IF MYSELF
WERE PRESENT.

DATE 7-1-57

*L. C. Boies*
SHERIFF OF MARICOPA COUNTY

---

We have previously held, State v. Stago, 82 Ariz. 285, 312 P.2d 160, that such a card was sufficient to fulfill the statutory requirements of an appointment in writing, that no particular manner is required for the board to evidence its consent, and that the filing with the county recorder was merely directory. Stago is not precedent for this case. There, the Board of Supervisors evidenced its consent to the appointment of a deputy sheriff by approving the bond given by him to indemnify the sheriff against the deputy's wrongful act. Here, the majority rely on the employment of the Board of Supervisors to supply ambulance service to the county as consent to an appointment as a deputy sheriff.

The facts of Silvio's employment to supply ambulance service are these: For some years prior to November 15, 1957, Silvio, doing business as the Phoenix Respiratory and Ambulance Service, had been under contract with the Maricopa County Board of Supervisors to supply "routine" and "emergency ambulance service" for Maricopa County. This contract was let on public bids. It provided for the furnishing of ambulances and ambulance equipment with drivers. Since Silvio's contract with the Board of Supervisors is the key to his employment, his bid containing the terms of his contract is reproduced in full.

**210**

## PHOENIX
## RESPIRATOR & AMBULANCE SERVICE

537–539 EAST MORELAND

PHOENIX, ARIZONA

· June 6, 1957

Clerk of the board of Supervisors
Courthouse Annex—Phoenix, Arizona                 Serial No. 598

Bid for emergency and routine ambulance service and respirator and oxygen service for Maricopa County.

Calls for service for all activities of the County (except the Sheriff's Office) within a radius of ten (10) miles of Central Ave. and Washington, per patient ---------------------------------------------- $4.50
*Mileage will be figured from point of pick up to destination* by speedometer reading (as per our bid—first 10 miles $4.50 additional miles 50¢ per mile.)

Oxygen per small tank ------------------------------------------- $1.50
Waiting time per hour (prisoners & detention cases) -------------- $4.50

Calls for handling of prisoners and detention cases for all areas in Maricopa County.  Per patient, first ten (10) per mile -------------- $4.50
For each additional mile above the first ten (10) per mile ------------ $ .50

EQUIPMENT
One Cadillac Ambulance
One Cadillac Sedan Ambulance
One DeSota Sedan Respirator & First-aid car.  Radio equipped.

All vehicles are equipped with respirators, oxygen and all other supplies listed in specifications in calls for bids for ambulance service; Serial No. 598

We agree to comply with all specifications listed in calls for bids for ambulance service in Serial No. 598.

PHOENIX RESPIRATOR & AMBULANCE SERVICE

(s) Anthony Silvio

Anthony Silvio—Owner   Dated: June 6, 1957
(Emphasis supplied.)

I cannot understand how it is possible to equate Silvio's independent employment by the Board of Supervisors with consent to appointment as a deputy sheriff. Consent is not a vacant or neutral attitude. De Klyn v. Gould, 165 N.Y. 282, 59 N.E. 95, 80 Am.St.Rep. 719. Consent implies knowledge of the facts. People ex rel. Vestuto v. O'Connor, 351 Ill.App. 539, 115 N.E.2d 810; State v. Wheeler, 38 N.D. 456, 165 N.W. 574. There is simply no evidence that the Board of Supervisors or any member knew or was aware that Silvio acted or purported to act, if he ever did, as a deputy sheriff for Maricopa County.

The evidence is contrary to the majority's conclusion of consent, being clear and uncontradicted that Silvio's appointment card was never intended to create the relationship of principal and agent in the sense of sheriff and regular deputy. The card given to Silvio by Sheriff Boies was an identification card to assist him in his ambulance service. Boies testified without contradiction relative to Silvio's card:

"Q Was that one signed by you?

"A It was.

"Q What was your intention when you signed it?

"A Merely as an identification card.

"Q As what did it identify Tony Silvio?

"A Well, the main reason that that was issued to Tony is on these rescue missions that he goes on, at many times there are so many people there that you have difficulty in getting to the scene of the accident or whatever it may be * * *.

"Q This was to permit him to get access as a deputy sheriff?

"A It necessitated getting access to the scene of whatever it might be.

"Q Anywhere he needed to go?

"A That is right."

Boies' testimony is that similar cards were given to the press, judges, bailiffs and probation officers. There is not one word of testimony that Silvio ever wore a sheriff's badge or uniform or performed any of the duties or functions of office of the sheriff. Agency is contractual and must rest upon consent of the parties. Valley Nat. Bank of Phoenix v. Milmoe, 74 Ariz. 290, 248 P.2d 740. It is too plain for further argument. Silvio was not a regular deputy sheriff of Maricopa County.

By giving the card the fullest possible import and even assuming consent by the Board of Supervisors, Silvio's status would be, at the most, no more than that of a special deputy with limited authority. The power of a sheriff to appoint deputies for a limited purpose is well recognized.

"It will be noted that none of the General Code sections above mentioned contains any provisions as to the appointment or employment of 'special deputies' or 'special deputy sheriffs.' Furthermore, there is no statutory definition of 'special deputy' or 'special deputy sheriff.' However, it will be noted that under the common law the sheriff had the right to appoint an under-sheriff and as many general or special deputies to assist him in the discharge of his various duties as the public service may require, and that such deputies act for the sheriff in his name and stead and are the sheriff's agents and as such agents may do any ministerial act that the sheriff may do.

\*     \*     \*     \*     \*     \*

"The time and extent of the exercise of the authority of the sheriff by such special deputy is a matter solely for the determination of the sheriff, as the deputy acts as his agent. *A deputy sheriff may be special in the sense that he is authorized to perform only part of the duties of the sheriff,* or may be special in the sense that he is appointed by the sheriff without being assigned to perform any duties of the sheriff but being subject to assignment to duty by the sheriff from time to time as the sheriff in his discretion may determine." State ex rel. Geyer v. Griffin, 80 Ohio App. 447, 457, 76 N.E.2d 294, 300. (Emphasis supplied.)

It is uncontradicted that the card issued by Boies was not a general appointment as a deputy sheriff but for identification and the limited purpose of assistance in obtaining access to the scene of accidents in Silvio's ambulance service.

The identification card on its face limits Silvio's purported appointment. It recites a regular appointment as a deputy sheriff and that Silvio is the sheriff's lawful deputy to act in all matters, but it had typed upon it the words "AMBULANCE SERVICE". These words must be given some significance; otherwise why would they be placed upon the card? The only possible construction is that Silvio was limited to acting for the sheriff in his duties of ambulance service. The card on its face was restricted to those purposes.

It should be here stated that Silvio was not paid a salary as a deputy sheriff, that he never claimed the right to make an arrest and that he never, at any time, arrested anyone, with the possible exception that on one occasion he arrived with his ambulance at a time when two deputy sheriffs were attempting to take into custody a violently insane person. After he arrived, he joined with the officers in subduing that person.

I can only conclude that Silvio was not a deputy sheriff simply because he was not

appointed according to law but if consent could possibly be inferred, the appointment was limited and did not include the authority to make arrests.

SECOND: If it can be said that Silvio had the ostensible appearance of a deputy sheriff, because of a radio and the sheriff's star on his ambulance, such appearance would not establish the liability of Boies for Silvio's act in shooting Cole.[1] This Court, in Hammels v. Britten, 53 Ariz. 112, 85 P.2d 992, adopted the rule of the Restatement of the Law of Agency, § 265:

"'*General Rule. Except where there has been reliance by a third person upon the appearance of agency*, one who has manifested that another is his servant or other agent does not thereby become liable for the other's tortious conduct, although it is apparently authorized or is within the apparent scope of employment.'" 53 Ariz. 112, 117, 85 P.2d 992, 994. (Emphasis supplied.)

The Court further quoted from the comment to the General Rule:

"'The fact that a person manifests to a third person that another is his agent or servant does not of itself cause harm. *It is only where there has been some reliance by a third person upon the appearance of a principal and agent* or a master and servant relationship that such appearance can be the basis of liability, *and then only if a subsequent harm is in some manner induced by the reliance*. Except in such cases, therefore, a person is not liable for the trespass, negligence, defamation, or other tort of an apparent servant or agent. \* \* \*'" 53 Ariz. 112, 118, 85 P.2d 992, 994. (First emphasis supplied, second emphasis in original.)

Accord Restatement of Agency, 2nd Ed., § 265.

If one is not an agent but is clothed by another with the appearance of agency, in order for the purported principal to be held for the tortious acts of the agent, the harm which results to a third person must have been caused by reliance on the appearance of agency, and the reliance must have induced the injury. By no stretch of the imagination is it possible to conceive how the appearance of agency could have resulted in Cole's death. Cole was not shot because he relied on the appearance of Silvio as a deputy sheriff. Nor was

---

1. There is no evidence that Cole saw Silvio's ambulance since Cole was in the house when Silvio arrived and hence that he saw the star or radio. Further, it should be emphasized that there is no evidence that Silvio wore a sheriff's badge or uniform or that he showed the identification card at the Cole home or that he stated he was a deputy sheriff. Silvio said: "Come on, Mr. Cole, we have, I'm going to take you out to the County Hospital for observation."

his death induced by reliance on that fact. Liability cannot be predicated on the grounds of ostensible agency.

THIRD: While there are only two types of agency, actual and ostensible, Canyon State Canners v. Hooks, 74 Ariz. 70, 243 P.2d 1023, actual agency may arise from implication; that is, be implied from the facts and circumstances. Arizona Storage and Distributing Company v. Rynning, 37 Ariz. 232, 293 P. 16. In the light of the majority's conclusions as to liability, it is necessary to examine the law and facts which might support an inference of implied agency.[2]

The principal opinion picks out certain bits of evidence to suggest, without so stating, that somehow Silvio had implied authority to take Cole into custody on the evening of November 15, 1957. At about 6:45 p. m., Silvio went to Cole's house where an inquiry developed that Cole was not at home. At that time a regular deputy sheriff had been sent and was there present with him.

"Q. Was there any other deputy in the neighborhood?

"A. Yes, there was another car, a deputy car, with me at the scene. I went alone in my car, but there was a deputy met me at the scene * * *."

Silvio then telephoned back to Sergeant Barnes at the sheriff's office and told him that Cole was not at home.

It is at this point that the words "pick up" were used. Silvio testified to this conversation with Barnes:

"* * * I didn't know what time they would be home; and I didn't want to stay out there all night waiting to *pick him up* and I wanted to know if it would be all right to go out the next morning and *pick him up*. And he says to me 'No.' He says, 'He has got to be *picked up* tonight because his wife is very scared of him and he will kill her if we don't *pick him up*.'" (Emphasis supplied.)

Silvio then waited until 10:00 p. m. and went back to the Cole residence. There is no explanation why Silvio went back to the Cole residence alone. Silvio further testified:

"I went to the door and knocked. Some one, I don't know which one of them, came to the door and let me in. I told them that I was from the sheriff's office and I came there to *pick up* Mr. Cole, to take him to the County Hospital for a medical examination and they told me to come in. * * *" (Emphasis supplied.)

---

2. The plaintiff requested and the trial court instructed over the defendants' objections in such a manner as could conceivably be considered an instruction on implied agency. This instruction has not been discussed or alluded to by the majority in the decision although raised by Boies' assignment of error No. 5.

The foregoing are typical examples of the use of the words "pick up" as reflected in Silvio's testimony. No other witness used these words except Silvio and the plaintiff never asked him to explain the meaning he attached to them.

It was Silvio's obligation to "pick up" patients in his ambulance service. The bid specifically provided "mileage will be figured from point of pick up to destination by speedometer reading." The principal opinion attaches to the words "pick up" the meaning of "to take into custody, arrest," citing Webster's Third International Dictionary. The verb phrase "pick up," as defined by Webster's, has no less than twenty different usages. Some common examples given as the meaning of "pick up" are: To lift from the ground; to do over, as in knitting; to bring within range of vision or hearing, as by telescope or radio; to pick up a girl, as in a bar; to prepare a meal; to gain speed; to gather up one's belongings, as to pick up a room; *to take passengers or freight into a vehicle.* The noun "pickup" has twenty-two meanings, among these are: Taking aboard of passengers; and Arrest. Manifestly, the words "pick up" as used in Silvio's bid is in the sense of "taking aboard passengers." What further or additional meaning Silvio gave to the words, if any, is unknown; but certainly there is no justification for arbitrarily shifting the meaning to arrest and hence concluding that "Silvio had been arresting people on order of the sheriff's department for four years," when by his contract he had been transporting people from the point of pick up for four years, including "prisoners and detention cases" for the sheriff's office.

What Sergeant Barnes, who was deceased at the time of trial, meant when he said to Silvio, "He has got to be picked up tonight," likewise finds no explanation in the record. Barnes unquestionably intended for Cole to be taken into custody that night. However, Barnes did not say, "You arrest him tonight," which is what would normally have been said if Silvio was to make the arrest. Every other use of the words "pick up" and "pick him up" by Silvio, from the context in which they are used, is completely consistent with the performance of his job which the Board of Supervisors hired him to do. Why Silvio took it upon himself to attempt to force Cole to go with him was not disclosed unless it was because he "didn't want to stay out there all night waiting."

But even assuming that Barnes intended for Silvio, in this particular instance, to make the actual arrest and Silvio so understood, Boies cannot be held responsible for the delegation of duties to a subagent without his authority, knowledge or acquiescence.

A principal cannot be held responsible for the actions of those appointed to act for

him by another without his authority. Such a person is no more than an agent of an agent, not the agent of the principal.

> "There is no evidence whatever that M. I. Phillips, conceded to have been an agent of the appellant, had any express authority to employ for his principal his son J. W. Phillips. * * * The test of liability of the principal for the tort of a subagent is believed to be the existence of authority, express or implied, given the agent to make the subagent the agent of the principal. Without such authority, a subagent would simply be the agent of the agent, but not of the principal." Gulf Refining Company v. Shirley, 99 S.W.2d 613, 615 (Tex.Civ.App.).

And see 3 Am.Jur.2d Agency, § 157, p. 546. There is no evidence that Barnes had the authority to appoint subagents to make arrests.

As has already been pointed out, there is no evidence that Silvio ever before personally served detention orders. The majority attach significance to the fact that Silvio picked up the detention orders at the sheriff's office. Obviously, when a mentally ill person is to be delivered to the county hospital some legal authority must accompany that person as authority for his detention. The orders would necessarily go with the ambulance as a matter of routine to be delivered with the patient to the hospital without which he could not be admitted. Certainly, a peace officer making an arrest by virtue of legal process is not required to have the warrant in his possession if he knows that a warrant in fact exists. The deputy sheriff making the actual detention would not need possession of the detention order to make a lawful arrest. But Silvio would need it for delivery to the proper personnel at the Maricopa County Hospital.

Silvio at no time purported to work for the sheriff, even if conceivably he thought he had some indefinite authority by reason of the identification card. He testified that he relied exclusively upon his contract with the county in ambulance service. This contract, as an incident of his work, fairly construed, required him to take passengers into his ambulance under certain circumstances, sometimes at the direction of the sheriff. His ambulance was to transport them and he was paid for this and only this. He was not hired to make arrests. He did not customarily or ever make arrests. He did not testify that he ever made the initial detention of a mentally disturbed person.

It is axiomatic in the law of agency that one is not liable for the acts of another who, without authority, assumes to act for him in the capacity of an agent or on his behalf.

" ' "The agent's authority, moreover, may not be shown merely by proving that he acted as agent. A person can no more make himself agent by his own acts only than he can by his own declarations or statements. * * * " Mechem on Agency, § 289.' ([Brutinel v. Nygren,] 17 Ariz. [491] at page 497, 154 P. [1042] at page 1044 [L.R.A. 1918F, 713].)" Bank of America Nat. Trust & Sav. Ass'n v. Barnett, 87 Ariz. 96, 100, 348 P.2d 296, 299.

While Silvio is undoubtedly personally liable for his conduct, I can find no reasonable evidence to support a judgment against Boies or Trinity Universal Insurance Company. Where facts are found by an appellate court to be undisputed by reason of the evidence being without material conflict and only a question of law is involved, the Court should direct that final judgment be entered. Silva v. DeMund, 81 Ariz. 47, 299 P.2d 638; State ex rel. Conway v. State Land Department, 62 Ariz. 248, 156 P.2d 901; A.R.S. § 12–2103. This cause as to Boies and Trinity Universal Insurance Company should be reversed with directions to enter judgment in their favor. Since I am of the opinion that this case should be disposed of in accordance with the conclusions stated, I do not reach the further questions decided by the majority.

McFARLAND, J., concurs in this dissent.