415 P.2d 579

**SOUTHERN PACIFIC COMPANY, a corporation, Appellant,**

v.

**Ruth L. BARNES, Administratrix of the Estate of Edith Lorraine Geer, deceased, Appellee.**

**No. 2 CA–CIV 151.**

Court of Appeals of Arizona.

June 17, 1966.

Rehearing Denied Aug. 8, 1966.
Review Denied Sept. 27, 1966.

Boyle, Bilby, Thompson & Shoenhair, by Richard M. Bilby, Tucson, for appellant.

Warren R. Brock, Tucson, for appellee.

MOLLOY, Judge.

This is an appeal from a judgment rendered in a wrongful death action upon jury findings against the defendant-railroad in connection with the death of an eleven year old girl who was killed on November 3, 1963, as the result of a crossing accident in the City of Tucson at the intersection of Ajo Way and the Tucson-Nogales spur line of the defendant.

The facts giving rise to the accident are stated favorably to upholding the judgment rendered below. The accident occurred at dusk on the evening in question, at a time when the Southern Pacific Company had a twenty-two car ore train heading north returning from a mining operation south of the City of Tucson. This railroad line was not heavily used, the evidence being that on the average nine trains passed in each way every ten days. The speed limit set by the railroad for the area of track in question was 49 miles per hour. This was the maximum allowed by applicable Interstate Commerce Commission regulations for "nonblock territories" such as this. Though it was customary for the Southern

Pacific Company to have a speed tape in all locomotives, which would have provided a record of the speed of this train, the tape on the particular engine had run out and was not recording at the time of the accident. Estimates of witnesses as to the speed of the train varied from 35 to 80 miles per hour.

Ajo Way is a heavily-traveled highway just to the south of the City of Tucson, with vehicles crossing the railroad track on the average of approximately one every ten seconds. As the train crew approached the intersection on the evening in question they could see a number of cars crossing the intersection ahead apparently unaware of the approaching train. The engineer did not attempt to reduce speed until the very instant of the collision giving rise to this action. The train crew had had near misses at this intersection on numerous previous occasions.

The vehicle in which the plaintiff's deceased was a passenger was driven by her grandfather, George F. Gray, who was joined as a defendant in the action. The Grays were on their way to evening church services, proceeding eastwardly, coming from the train's left side, when their car was hit on its right rear side. This locomotive was constructed in such manner that the engineer, sitting on the right side, had practically no view to the left side of the track ahead. The fireman, sitting on the left side of the cab, had his view to the left side substantially blocked by a steel plate. The head brakeman, riding on the left side behind the fireman, had a better view to the left and prior to the collision realized there was imminent danger of a collision with the Gray car. He reached down to secure his lantern, turned same on, and pointed the beam of the lantern at the approaching car to attempt to warn it of the presence of the train. No effective warning, however, was given to the engineer, who testified that his first awareness of this car was when he saw the front headlight of it on his side of the engine a split second before the collision.

There was no flashing light or other automatic signaling equipment at the intersection in question, the only warnings being a standard "crossbuck" signal located to the right of Ajo Way at the edge of the railroad right-of-way and a standard highway railroad crossing sign some 300 feet back on Ajo Way. The engine in question had headlights on but the lights were of an older type than used in many locomotives, which more modern lights ("Mars" type) oscillate so as to be more apt to attract the attention of traveling motorists. Both the bell and the whistle of the train were sounding prior to the accident. The driver of the car in which the deceased was a passenger was an elderly person, with some impairment to his hearing. There was an obstruction to visibility in the southwest quadrant of this intersection, consisting of a house and some trees, 150 feet back from the intersection, which could have interfered with Mr. Gray's detection of the oncoming train. A passenger in another car proceeding in the opposite direction to the Gray vehicle, without any such obstruction, testified that the car in which she was riding was almost struck by the train and they were not aware of the presence of the train until it was within ten or fifteen feet of them. Their car had to accelerate abruptly to beat the train across the track.

Officials of the defendant-railroad who were in charge of determining whether automatic signaling equipment should be installed at crossings testified that the most important factor in determining whether such signaling equipment should be installed was the accident record of the particular crossing. In their opinion, any accident at this crossing, without any time limit expressed as to when the accident happened, would be pertinent to this determination. Prior to this accident, there had been vehicular crossing accidents at this same location sometime in 1954: November 26, 1955; on November 24, 1956; on January 15, 1957; on January 31, 1961; on January 20, 1962; on April 1, 1962; on May 26, 1962; on December 11, 1962; and on February 21, 1963. The January 20, 1962 accident was a fatal one.

The defendant introduced in evidence a tabulation of crossing accidents in Pima County since January 1, 1964, which went past March 9, 1964, the date of the installation of a flashing light signal at Ajo Way. After this, there were no further accidents at the crossing. Prior to November 3, 1963, the date of the instant accident, there had been a total of thirty accidents at the eighty-three railroad crossings in Pima County since January 1, 1961. Six of these (20 per cent) had occurred at the subject crossing on this comparatively seldom used spur line. The maximum speed limit for the area of track in question had been increased from 20 to 25 miles per hour on February 17, 1960 and on May 2, 1961 it had been increased from 25 miles per hour to 49 miles per hour.

As early as June 11, 1962 the defendant had determined that it would be advisable to install an automatic flashing light signal at this crossing and had written to the City of Tucson asking for financial contribution to the cost of such a signal. The cost of the signal in question was $6,070. The railroad was of the opinion that under applicable law it could require the City of Tucson to pay one-half of the cost of the installation. The city, however, did not respond promptly to the inquiry, and did not prior to the accident in question agree to pay for any share of the signal. For this reason, the signal was not installed until after the accident in question.

The first question presented for review is stated in the appellant's brief as follows:

"Can portions of complaints filed in previous cases against the Defendant railroad arising out of accidents at the crossing in question be read to the jury where the railroad has already admitted notice of the prior accidents in question?"

An examination of the record indicates the following sequence of procedures giving rise to the question so presented. As

a preliminary discovery device, the plaintiff had filed in this action interrogatories to the defendant among which was the following question:

"What collisions prior to 8 years before the accident have occurred between Southern Pacific Company trains and motor vehicles at the grade crossing prior or subsequent to the accident in question? Please give the name or names of persons involved, known witnesses to any accidents, the name of the engineer and fireman of any train involved in a collision with a motor vehicle and the dates upon which such accidents occurred."

To this question, the defendant filed under oath a statement of accidents at this crossing beginning with the accident of January 31, 1961, but omitting three prior accidents which were within the time limit of the question.

Also, an interrogatory was submitted as follows:

"Has anyone within 8 years prior to the accident or subsequent to the accident complained or otherwise made comment to the Southern Pacific Company through any of its officers, agents, or employees, either orally or in writing, that the crossing in question was dangerous, hazardous, unsafe or other statements of like import?"

To this interrogatory, the defendant filed the following answer:

"No record of complaints or other comments to the Southern Pacific concerning crossing conditions within the 8 year period prior to the accident or subsequent to the accident."

These two interrogatories and answers thereto were admitted in evidence and no question is raised on appeal as to the propriety of so doing. Previous to the admission of these interrogatories, the trial court

had ruled at the instance of the plaintiff and over the objection of the defendant that portions of complaints filed in the superior court of Pima County against the defendant because of Ajo Way crossing accidents were admissible " * * * only on the issue of notice." Thereafter, the court permitted the plaintiff to read into the record portions of four complaints filed in civil actions claiming damages for injuries suffered in crossing accidents at the intersection in question. The portions of the complaints read were limited to the names of the parties and the allegations of negligence pertaining to the condition of the crossing together with the dates that it was alleged the crossing was negligently maintained.

The first complaint so read alleged that on October 1, 1954 the defendant maintained the crossing " * * * in a negligent manner." The second complaint alleged that on January 15, 1957 the defendant maintained the crossing in a " * * * defective, dangerous and unsafe * * *" condition. The third alleged that on January 31, 1961 the defendant " * * * so negligently planned, established, maintained and controlled one of its railroad crossings, to-wit, * * * that said crossing was defective, dangerous and unsafe for use by automobile travelers using due care for their own safety." The fourth complaint alleged that on January 20, 1962 the defendant " * * * so negligently planned, established and maintained * * * that said crossing was defective, dangerous, hazardous and unsafe for use by motor vehicles."

After the introduction of this evidence, the defendant's clerk who was in charge of keeping accident records for the railroad was called to the stand by the plaintiff[1] and from her the information as to all of the accidents occurring at the intersection in question, both before and after January 31, 1961, was developed and no question is

---

1. The defendant's contention that it had "admitted" notice of the previous accidents is apparently based upon the fact that the deposition of this witness had been taken prior to trial by the plaintiff. This deposition, however, was never introduced in evidence.

raised on appeal as to the propriety of so doing. In its reply brief the defendant states:

> "If Plaintiff in good faith had been seeking solely to prove notice to the Defendant, all she would have had to do was produce a witness (Clerk of the Superior Court) who could testify that four cases had been filed against the railroad alleging accidents had occurred at this crossing. Instead of pursuing this legitimate course, counsel for Plaintiff offered in evidence and was permitted to read to the jury excerpts from four complaints * * *."

It is clear from this and other sections of the defendant's brief that it makes no contention that the occurrence of these previous accidents,[2] the filing of the lawsuits, and notice to the defendant of such are not material to this action. It impliedly concedes that if these facts are established in a "legitimate" way, they are admissible against the defendant. The defendant complains only that the language quoted above used in prior complaints was read to the jury. This language is charged to be " * * * inflammatory * * *."

It is conceded by the appellee that such allegations could not be admitted to establish the truth thereof and that use for such a purpose would be a violation of the defendant's right to cross-examine witnesses. However, appellee contends that the evidence was admissible to establish knowledge on the part of the defendant that the plaintiffs in these four previous suits were contending that the crossing in question was unreasonably dangerous for the traveling public.

■ It is well-established in our law that the fact that evidence is not admissible for one purpose does not exclude the evidence if it is admissible for another legitimate purpose. Alires v. Southern Pacific Company, 93 Ariz. 97, 107, 378 P.2d 913,

920 (1963). As pointed out in the Alires case, one of the legitimate issues in an action such as this is whether the defendant had knowledge that there was an unreasonable risk of harm to others in connection with this crossing:

> "This knowledge, that the personal defendants were aware of, *not alone the individual facts* the sum of which establish a 'bad crossing' (extra hazardous) *but that the sum did create an unreasonable risk of harm to others,* was provable like any other fact in the case." (Emphasis added) 93 Ariz. at 107, 378 P.2d at 919.

■ It seems to be the general law that warnings or complaints of a danger or a defect, when communicated to the person chargeable with the maintenance of such a condition, are admissible in evidence to show the knowledge of such person of the danger, in cases where knowledge of danger is an issue. A general statement of this law is:

> "Evidence that, before the accident or injury, complaint of a danger or defect had been made or warning thereof given to the person charged, by the other party, or by a third person, or by the person charged to a third person, is admissible to show the knowledge of, or notice to, the person charged of such defect or danger, but where knowledge or notice is not an issue evidence of warnings is immaterial." 65 C.J.S. Negligence § 228, p. 1045

See also 88 Am.Jur. Negligence § 325, p. 1021; 2 Wigmore, Evidence § 252, p. 69.

If the complaints that the crossing in question was being maintained in an unsafe condition had been in the form of letters from chambers of commerce or other disinterested third persons, there would seem to be little question but what the same would be admissible in evidence under the general law. Jensen v. Southern Pacific

---

2. Cf., Slow Development Company v. Coulter, 88 Ariz. 122, 125, 353 P.2d 890, 892 (1960) as to the foundation necessary for the occurrence of previous accidents to be admissible.

Company, 129 Cal.App.2d 67, 75, 276 P.2d 703, 709 (1954); Fort Worth & D. C. Railroad Co. v. Looney, 241 S.W.2d 322 (Tex. Civ.App.1951); Tennessee Central Railway Co. v. Dunn, 24 Tenn.App. 383, 145 S.W.2d 543 (1940); Annot. 125 A.L.R. 645 (1940).

The fact that these particular complaints as to this crossing were contained in pleadings filed in civil actions does not, in our opinion, necessarily render them impotent under ordinary rules of evidence.[3] Obviously such a complaint has less probative value than a complaint from a disinterested party, but this difference would seem to be a matter of weight rather than admissibility. Because of the possibility of injecting collateral issues into a case, the admission of the type of evidence under discussion merits the closest scrutiny of the court.

In this case, the outcome of previous litigation was not mentioned. The language used in the previous complaints was no more "inflammatory" than that used in the typical negligence action. Once it was established that suits were filed, a jury would hardly expect that verbal bouquets were passed therein. The railroad raised no contention as to dissimilarity in conditions between those existing at the times involved in these complaints and those existing at the time of this accident. Under these circumstances, we hold that no error was committed by the admission of this evidence.

The appellant relies upon the decision of Martindale v. Atchison, T. & S. F. Ry. Co., 89 Cal.App.2d 400, 201 P.2d 48 (Cal. 1948), which upheld a trial court in refusing to admit in evidence letters from the Road Commissioner of Los Angeles County to the defendant-railroad company recommending that wigwag signals be installed at a certain railroad crossing. The court said:

"They were not admissible for the purpose of showing defendants' knowledge of previous accidents since manifestly the railway company already had knowledge thereof and made no contention that it was not possessed of such knowledge." 201 P.2d at 55

It seems to this court that though this case is close to being in point factually, it misses the mark in understanding the fundamentals of the evidentiary law with which we are dealing. In most of the warning cases in which evidence of prior warnings have been admitted, a rejection of the evidence could be summarily justified under the reasoning of the Martindale decision. Knowledge of individual physical facts does not necessarily bring home the knowledge that the situation as a whole presents a dangerous situation and a warning to this effect is in itself a fact which may be considered along with other facts in determining whether there is negligence.

The fact that accidents had occurred at this crossing does not necessarily carry with it the connotation that the railroad was advised that its maintenance of this crossing was unsafe. Previous accidents may have taken place under circumstances so clearly absolving the defendant from blame that no complaint whatsoever resulted. Under such circumstances, the fact that an accident occurred alone has minimal probative value. Nor would prior litigation from accidents at this crossing alone indicate that there was any complaint as to the planning and/or maintenance of the crossing itself. Prior litigation could have been based upon failure to sound a whistle or bell, or other causes unrelated to the condition of the crossing. Contrariwise, the fact that accidents at this crossing had resulted in formal charges of negligent maintenance of the crossing is some evidence that the railroad had knowledge of a dangerous condition and was negligent in perpetuating this same condition. We reject the reasoning and holding of Martindale in favor of what

---

3. Cf., Davidson v. Wee, 93 Ariz. 191, 379 P.2d 744 (1963), holding that the filing of a complaint can serve as notice of a breach of warranty.

we consider to be the better and majority view.

▓ Appellant points out that there was no limiting instruction by the court as to the use to be made of those portions of prior civil actions read in evidence. This is so, but the reason for the admission by the court appears clearly in the record (". . . only on the issue of notice."). The defendant made no request for a limiting instruction in this regard, and cannot complain now that one was not given. State v. Maxwell, 95 Ariz. 396, 391 P.2d 560 (1964); Udall, Arizona Law of Evidence, § 11, p. 23.

The appellant further complains that there was evidence admitted over objection of the existence of a flagman at a private road crossing completely dissimilar to the Ajo Way crossing. This contention is best understood by quoting from the transcript. This testimony was elicited by counsel for the defendant Gray on cross-examination of the defendant's engineer:

"MR. CHANDLER: [Attorney for defendant Gray] "Q Are there crossings between here and Nogales, Mr. Hesla, where there is actually a flagman that flags vehicular traffic?

"MR. BILBY: Same objection, Your Honor, No foundation.

"THE COURT: Overruled.

"You may answer that.

"THE WITNESS: I may answer? There was at one time a crossing, yes.

"MR. CHANDLER: Q Where was it?

"A That was on what is known as the Eagle Pitcher Road right at Sahuarita past the store.

"Q What was the reason for putting the flagman out before the train crossed the track?

"MR. BILBY: Same objection, Your Honor. No foundation whatsoever. Immaterial to this case. No showing the crossings are alike or that there is a public crossing or anything of the nature.

"THE COURT: Well, I am going to overrule the objection.

"You may go into those issues.

"You may answer the question. What was the reason for putting out a flagman there if you know?

"THE WITNESS: My assumption, and it is just my assumption, is that that track going up to Eagle Pitcher mine is privately owned."

The court agrees that this testimony has no materiality to the instant action. It is, however, apparent that the trial court was attempting to limit evidence of the use of flagmen to those actually being provided by the defendant-railroad on its Tucson-Nogales spur line at the time of the trial. Instead, there was elicited testimony that at " * * * one time * * * " a flagman had been used where a private railroad track to the Eagle Pitcher mine crossed some highway. There was no motion to strike the testimony after it was given.

▓ While the admission of this testimony was error, this court does not believe that it was of such magnitude as to merit reversal. There is no showing that the plaintiff at any time made any contention to this jury that the defendant was negligent in failing to provide a flagman. The plaintiff's contentions of negligence were set forth in her pretrial memorandum and in requested instructions to the jury, and in none of these was any contention made pertaining to the failure to provide such a service. The final arguments of counsel are in the transcript. Plaintiff's counsel did not argue that liability should be predicated on the failure to provide a flagman. Neither did the counsel for the defendant Gray, who was responsible for injecting this evidence into the record, so contend. It is difficult to conceive that the jury would be influenced in any way by the fact that at one time the defendant may have provided a flagman where a private railroad track to the Eagle Pitcher mine crossed some unidentified highway. We believe the constitutional mandate (Article 6, sec-

tion 27, A.R.S.) against reversal for non-prejudicial error is pertinent.

■ The next question raised on appeal is whether it was error for the trial court to permit the plaintiff to elicit testimony from the fireman and the head brakeman who were in the cab of the engine on the evening of the accident that in their opinion *at that time* (November 3, 1963) this was a "* * * dangerous" (the head brakeman), "* * * particularly dangerous * * *" and "extra hazardous" crossing (the fireman). This testimony was elicited over the objections that it was opinion evidence, not binding upon the defendant and immaterial.

We believe the contentions of the appellant in this regard were considered by our Supreme Court in Alires v. Southern Pacific Company, 93 Ariz. 97, 378 P.2d 913 (1963), and rejected. In the Alires decision the court was dealing with an opinion of the fireman as to the dangerousness of the crossing which was expressed, not in the trial of the action itself, but rather at an inquest. The opinion of this crew member was held to have been wrongfully excluded, the court holding that the opinion so expressed indicated a knowledge of danger which was pertinent to the issues before the court for trial. The court said:

"Knowledge by those in charge of the train of the particular bad character of the crossing was relevant not only to determine whether ordinary care was used, but to determine whether defendants' conduct reached the level of wantonness—that is, whether the train was being operated with a reckless indifference to the lives and safety of others using the crossing considering the want of special safety measures." 93 Ariz. at 107–108, 378 P.2d at 920.

The fact that the opinion of the crew member is expressed in this case in the action itself, where the opposing party has opportunity to cross-examine, rather than extrajudicially, should not render such evidence inadmissible.

■ We do not believe the fact that the fireman was a party defendant in the Alires case is critical to the determination of admissibility. The fireman was one of the employees of the defendant having some measure of control over the train at the time of the collision and his knowledge of the dangerous condition of the crossing would be imputed to his employer. Restatement (Second), Agency section 272 (1958).

■ As in Alires, we are also concerned here with punitive damages. Since the decision of Southern Pacific Company v. Boyce, 26 Ariz. 162, 223 P. 116 (1924), it has been the law in this jurisdiction that a railroad employee who is guilty of wanton or gross negligence while acting within the scope of his employment may subject his employer to punitive damages. We do not believe, therefore, that this additional grounds for admissibility of this evidence, as recognized in the above quotation from the Alires case, is rendered inapplicable because the employee is not joined as a party defendant.

We pass onto the appellant's contentions in regard to the proper measure of damages. It was the original position of the appellant herein that the court wrongfully instructed that elements other than strictly pecuniary loss should be considered in awarding compensatory damages. The appellant now concedes that this contention has been rejected by our Supreme Court in Boies v. Cole, 99 Ariz. 198, 407 P.2d 917 (1965).

■ Also it was originally contended that punitive damages could not be awarded in a wrongful death action in this state. Likewise, the appellant concedes that Boies v. Cole, supra, decided this question favorably to the position of the plaintiff herein. The appellant maintains at this time, however, that there was insufficient evidence in this case to establish that degree of recklessness and wantonness which is a predicate in this state for punitive damages. Lufty v. R. D. Roper & Sons Motor Co., 57 Ariz. 495, 115 P.2d 161 (1941). In de-

termining whether this question should have been submitted to the jury, we are constrained to view the evidence in a light most favorably to the position of the plaintiff. Alires v. Southern Pacific Company, 93 Ariz. 97, 109, 378 P.2d 913, 921 (1963).

We have already set forth some of the evidence which we believe the jury might consider as being some indication of gross negligence. The testimony that the train was traveling between 70 and 80 miles per hour was elicited from a driver approaching from the east immediately prior to the collision with ample opportunity to observe the train as it approached the crossing. This driver was a person with twenty-five years of experience as an operator of a motor vehicle with previous employment as a deputy sheriff and with the military police. The defendant's engineer estimated his speed at the time as 45 miles pers hour. The crossing in question is more heavily-traveled by vehicular traffic than the crossing involved in the Alires case, which crossing the court characterized as " * * * heavily traveled * * *." (93 Ariz. at 101, 378 P.2d 913.) Significantly, the railroad line in question is a spur track with relatively minor use by the railroad. Habitual users of the crossing, such as Mr. Gray, may have developed the bad habit of not expecting trains at this crossing. It was dusk at the time of the accident, rendering it somewhat more possible that the train would not be seen. The accident occurred at a time of year and of day when car windows might be closed. The drivers of two other cars besides Mr. Gray had difficulty realizing the presence of this particular train as evidenced by the fact that there was a near miss as to a car that went by going west just ahead of the train and as to another car also going west which stopped just short of the intersection at the last second.

There was evidence from which the jury might have gathered the impression that the defendant was overly concerned with the economics of railroad operation and in-

sufficiently concerned with human injury. The accident record at this particular crossing had demonstrated to cognizant railroad officials some eighteen months before the accident in question that automatic signaling devices were warranted under normal practices, but the same were not installed because of the failure to secure a commitment to reimburse the railroad for one-half of the cost of installation, which would have been the sum of $3,035.

There was testimony from the engineer in charge of this train indicating that he was given little discretion to slow down for this crossing. Among such testimony was the statement made by him: "Trains have to be operated. They have speed limits, time schedules, and they are expected to be met irregardless of what takes place at grade crossings or other places in the past."

Also, this engineer testified:

"They have engineers in both city, county, state and railroad offices that determine those situations as far as I am concerned and the railroad hadn't put out anything to the contrary, about slowing down for the crossing, * * *."

This impression of the engineer as to the limitations upon his discretion to slow down might have been considered to have been corroborated by the testimony of the division superintendent of the defendant who testified in response to a question as to whether train crews were consulted as to their views on whether crossings were hazardous:

"No, sir, we do not, because they are specialists in handling an engine and we have specialists in handling this type of work. We think our people are probably better trained than some train and engine men in this respect."

The manner of the construction of the particular engine in question, together with the speed at which it was being operated, might have been considered by the jury as evidence of recklessness. Approaching a busy crossing, on a seldom used track, at dusk, the engineer in charge of the train had

practically no view to the left side of his engine and the fireman, who is next in charge, had very limited visibility to his left. There was testimony from the division engineer of the defendant that the speed limit set for trains is not reduced because of the accident record at crossings and that the speed of the train is not considered an important factor by the railroad in causing grade crossing accidents. This witness testified that trains slow down in towns in order to avoid collision with other trains and that the reduced speed in town is not materially affected by vehicular and pedestrian traffic. And yet the physical facts of the subject accident may have indicated to the jury that if this train had been going only a fraction slower, the Gray car would have been across the track without injury.

Taking this evidence together, we hold there was sufficient evidence from which a jury may have concluded " * * * that there was a high degree of probability that substantial harm would inevitably result to persons in the position of the passengers * * *" (Alires v. Southern Pacific Company, 93 Ariz. at 109, 378 P.2d 913) in the Gray vehicle, and that punitive damages were therefore merited.

 The appellant contends that the trial court ruled that this was not a proper case for punitive damages when it denied the plaintiff's request for an instruction on punitive damages. We do not believe this to be the case, as the instruction refused would have allowed the jury to assess " * * * *additional* punitive or exemplary damages * * *" (emphasis added). The instructions given allowed damages for "aggravating" circumstances, in this language:

" * * * if you return a verdict for the plaintiff, you may increase or reduce the amount you find fair and just by reason of any aggravating or mitigating circumstances attending the act, neglect or default which caused the death of Edith."

The interrogatories to the jury, upon which the judgment below was predicated, clearly separated compensatory damage from damage that might be allowed for aggravating circumstances:

"Interrogatory No. 3:

"If either interrogatory No. 1 [the issue of negligence as to the defendant Gray] or No. 2 [the issue of negligence as to the railroad] is answered 'yes', what is the amount of actual damage which the plaintiff should receive?" (The jury returned an answer of "yes" to both interrogatories 1 and 2 and answered this interrogatory: "$35,000.00".)

"Interrogatory No. 5:

"If interrogatory No. 2 is answered 'yes', should the amount of actual damage stated in your answer No. 3 be either increased or decreased because of aggravating or mitigating circumstances upon the part of Southern Pacific, or should it remain the same?" (To which the jury returned an answer that the actual damages should be increased by the sum of $20,000.00.)

The defendant requested no instruction which would have enlightened the jury further as to its duty in determining damages to be allowed for aggravating circumstances. The language given to the jury is directly from the statute (A.R.S. § 12–613) interpreted in Boies v. Cole, supra, and the language is not so technical as to be unintelligible to the average juror. We fail to see that fundamental error was committed and do not reverse for the failure of the court to give more enlightening instructions on this subject. Moore v. Gray, 2 CA–CIV 160, 3 Ariz.App. 309, 414 P.2d 158, filed May 17, 1966.

 The appellant contends that the trial court abused its discretion in failing to reduce the excessive damages awarded the plaintiff. The deceased eleven year old was an honor roll student in the top one per cent of her class. She was the winner of a citizenship award of her school for all

around good citizenship. She was in extremely good health. She was well adjusted socially and had a fine relationship with her family. In view of the fact that damages for wrongful death in this state are not limited to pecuniary loss, Boies v. Cole, supra, we hold that the amount awarded by the jury is not so excessive as to be subject to being reduced by this court. Moore v. Gray, 2 CA–CIV 160, 3 Ariz.App. 309, 414 P.2d 158.

The appellant finally contends that there was no evidence of negligence on its part which contributed to the accident in question and that the judgment should be rendered in its favor. We believe this contention has been answered by the holding of the court in regard to gross negligence.

Judgment affirmed.

KRUCKER, C. J., and HATHAWAY, J., concurring.